**TRUFORM, INC., Plaintiff–Appellee, Cross–Appellant,**

v.

**GENERAL MOTORS CORPORATION, Defendant;**

**American Axle & Manufacturing, Inc., Defendant–Appellant, Cross–Appellee;**

**Clarence Burkholder, Third-party Defendant–Appellee.**

No. 01–4301, 02–3015.

United States Court of Appeals, Sixth Circuit.

Nov. 17, 2003.

Ronald N. Towne, Ann L. Wehener, Guy, Lammert & Towne, Akron, OH, for Plaintiff–Appellee/Cross–Appellant/Third Party–Appellee.

David M. Saperstein, Garan, Lucow, Miller, Seward, Cooper & Becker, Detroit, MI, for Plaintiff–Appellee/Cross–Appellant.

Michael A. Thompson, Eric J. Williams, Krugliak, Wilkins, Griffiths & Dougherty, Canton, OH, for Defendant–Appellant/Cross–Appellee.

Before BOGGS, Chief Circuit Judge; RYAN, Circuit Judge; and ROSEN, District Judge.[*]

RYAN, Circuit Judge.

Truform, Inc., a manufacturer of automotive parts, brought a breach of contract action against General Motors Corporation and American Axle & Manufacturing, Inc. During the course of the litigation, Truform dismissed its claims against General Motors, but proceeded against American Axle for claims of breach of contract, fraud, and economic duress. American Axle filed counterclaims against Truform for breach of contract, breach of implied warranty, and breach of express warranty, and added Clarence Burkholder, president of Truform, as a third-party defendant.

## I.

The district court had jurisdiction over this dispute under the federal diversity statute. 28 U.S.C. § 1332. Following a bench trial, the district court entered a mixed judgment, partly for Truform and partly for American Axle, and awarded damages to each, which resulted in a net award for Truform of $427,285.32 plus prejudgment interest. For the reasons we shall explain in detail, we affirm the district court's judgment in all respects.

## II.

From 1973 until December 1999, Truform manufactured parts for steering linkages for ultimate installation in General Motors vehicles. Pursuant to a series of agreements with GM, Truform supplied parts to GM's plant in Buffalo, New York. In 1994, GM sold the Buffalo plant to American Axle. As part of the sale, American Axle and GM entered a Component Supply Agreement, under which American Axle agreed to manufacture drive line components for GM, using parts from suppliers, including Truform, that GM had selected. GM's separate agreements with Truform and American Axle had the practical effect of requiring American Axle to manufacture drive line components at the Buffalo plant using parts supplied by Truform.

The record contains copies of GM's written agreements with both parties. GM issued an order to Truform, effective January 1, 1993, to "extend [Truform's] contract ... to meet [GM's] production requirements" until December 31, 1997. When American Axle bought the Buffalo plant in 1994, it agreed under the Component Supply Agreement to purchase all of

---

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

its supplies directly from GM. The agreement permitted American Axle to schedule deliveries, receive material, manage supplier performance, and issue releases against GM's purchase orders. The agreement made it clear, however, that GM would make the final decisions regarding suppliers. Although American Axle was required to purchase its supplies from GM, it did not pay GM directly for the parts. Instead, American Axle paid GM's suppliers on behalf of GM in exchange for a corresponding credit toward American Axle's debt to GM.

GM, American Axle, and Truform performed their contractual obligations from 1994 until at least 1998. Pursuant to the agreement between GM and Truform, GM would issue purchase orders to "buy" parts from Truform, but would not pay Truform directly for the parts. GM would then instruct Truform to deliver the parts and the invoices to American Axle at the Buffalo plant. When the parts that had been "bought" by GM arrived at the plant, American Axle would "buy" the parts from GM by paying Truform on behalf of GM. In effect, Truform sold parts to GM but delivered the parts to American Axle, which then paid Truform on behalf of GM.

Sometime in early 1998, American Axle became dissatisfied with Truform's performance. However, the agreement between American Axle and GM prohibited American Axle from terminating Truform and selecting a different supplier. In March 1998, American Axle began billing Truform for "containment costs," meaning costs incurred by American Axle because of poor products delivered by Truform. American Axle intended to deduct these containment costs from Truform's invoices. Truform objected to the charges, claiming that if American Axle imposed the cost recoveries, Truform would be driven out of business.

After several months, American Axle stopped sending Truform notices of containment costs. American Axle could not afford to put Truform out of business because at the time, GM had not given American Axle permission to select a different supplier. If Truform went out of business and American Axle could not obtain the parts that Truform supplied, GM's assembly facilities could be shut down, causing substantial economic losses all around. Although American Axle stopped sending containment cost notices to Truform, it continued through 1999, to develop cost containment or cost recovery data, internally. A witness for American Axle testified that it did so to protect the efficiency ratings of its departments that had to spend time dealing with Truform's defective parts. For the rest of 1998 through the end of 1999, American Axle withheld its cost recovery calculations from Truform.

The district court found no credible evidence that GM issued a purchase order to Truform in 1999. It found, however, that throughout 1999, American Axle delivered weekly "planning schedules" to Truform, which forecast American Axle's upcoming needs for parts. American Axle also delivered "shipping schedules" to Truform, which controlled Truform's production and delivery of these parts. During 1999, American Axle constantly altered its shipping schedules, making Truform's operations so chaotic that it was impossible for Truform to meet American Axle's changing demand for supplies.

The court found that by the middle of 1999, American Axle learned from GM that it would be permitted to retain a different supplier. In the final months of 1999, American Axle attempted to secure maximum production from Truform in order to have sufficient inventory on hand during the transition to the new supplier. Ameri-

can Axle did not pay Truform's September, October, and November 1999 invoices, but continued to request that Truform produce and ship parts to the Buffalo plant. On November 1, 1999, American Axle sent Truform a purchase order for 1999 and at the same time informed Truform that it was setting off its containment costs against the amount it owed for parts received. American Axle calculated its containment costs to be $2,100,000, but later reduced that figure to approximately $1,800,000.

Based on these findings of fact, the district court held that Truform and American Axle had an implied contract with one another, which had been breached by both parties. American Axle breached the contract by refusing to pay Truform for parts that Truform had manufactured and delivered from September through November 1999. Based on American Axle's failure to pay, Truform was entitled to $353,609.03 in costs and $75,000 in consequential damages. However, Truform also breached the contract by delivering nonconforming parts. The district court deducted the value of these parts, $1,323.71, from the damages that American Axle owed to Truform. The court found that the facts did not support Truform's claims for fraud or economic duress and that American Axle was not entitled to recover its containment costs because it had expressly waived its right to any recovery. American Axle could neither assert GM's contractual rights against Truform nor enforce GM's warranty claims against Truform because Truform was unaware of the agreement between American Axle and GM. The only costs American Axle could recover were its documented losses from Truform's nonconforming parts. The district court calculated the prejudgment interest using the rate applied in Michigan.

American Axle appealed the district court's judgment, claiming that it did not have an implied contract with Truform. American Axle also claimed that the district court erred in holding that American Axle could not assert GM's rights against Truform, that American Axle had waived its right to recover any setoff costs, and that American Axle could not recover on its breach of warranty claims.

Truform filed a cross-appeal, claiming that the district court erred in holding that American Axle was not liable for fraud or economic duress. Truform also challenged the district court's award of damages, claiming that it was entitled to more than $75,000 in consequential damages and that the district court did not apply the correct rate of interest to the judgment.

### III.

Under Federal Rule of Civil Procedure 52(a), the district court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." We give due regard "to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a). A factual finding is clearly erroneous only when we are "left with the definite and firm conviction that a mistake has been committed." *Bank of Lexington & Trust Co. v. Vining–Sparks Sec., Inc.,* 959 F.2d 606, 609 (6th Cir.1992) (internal quotation marks and citations omitted). We may not reverse the district court's findings of fact simply because we might have decided the case differently. *MX Group, Inc. v. City of Covington,* 293 F.3d 326, 331 (6th Cir.2002). "[If] there are two permissible ways to view the evidence, the district court's decision to view the evidence in one of those ways as opposed to the other cannot be clear error." *Id.* The district court's conclusions of law and mixed questions of law and fact are reviewed *de novo. Lansing v. City of Memphis,* 202 F.3d 821, 828 (6th Cir.2000).

Whether a contract exists is an issue of fact reviewed under the "clearly erroneous" standard. The interpretation of a contract is a question of law and is reviewed *de novo*. Whether a contract has been breached is also a question of law and therefore subject to *de novo* review. The district court's computation of damages is a finding of fact reviewed for clear error.

A district court's findings of fact are to be liberally construed in support of its judgment, even if the findings are not as explicit or detailed as we might desire. *Grover Hill Grain Co. v. Baughman–Oster, Inc.*, 728 F.2d 784, 792 (6th Cir.1984). "If, from the facts found, other facts may be inferred which will support the judgment, such inferences should be deemed to have been drawn by the District Court." *Id.* at 793. The failure to make an express finding of a particular fact does not require reversal if a complete understanding of the issues is possible without separate findings. *Id.*

### IV.

The fundamental issue in this appeal is whether the actions taken by Truform and American Axle amounted to an implied contract. The parties agree that Michigan law governs the contract claims. The district court concluded that under Michigan law, the parties expressed a mutual intention to act. Although Truform's and American Axle's separate written agreements with GM required them to do business with one another, they also had a direct *unwritten* agreement with one another, which, as we have said, the court termed a "contract implied in fact." According to the district court, the parties' conduct from at least September through November 1999 gave rise to the terms of the contract, which included the following: (1) American Axle was required to submit to Truform an order for parts to be manufactured and shipped to American Axle; (2) American Axle could either return non-conforming parts or take a credit against amounts due to Truform; (3) American Axle was required to pay Truform on the twenty-fifth day of each month for parts shipped in the previous month; and (4) American Axle had the right to issue cost recovery notices to Truform according to specific procedures.

American Axle argues that the district court erred in concluding that it had a contract implied in fact with Truform and that Truform had no basis for its breach of contract claim. American Axle states that Truform expressly contracted with GM, but never contracted in any manner with American Axle. American Axle also claims that it never assumed GM's legal obligations to Truform and that, therefore, Truform should not have dismissed GM as a defendant. Instead, Truform should have maintained its breach of contract claim against GM; then GM could have sued American Axle. American Axle argues that if there was an implied contract, the district court erred by not awarding damages based on Truform's breach of that contract. American Axle claims that it incurred costs because of Truform's failure to timely deliver parts. If Truform was entitled to any damages, the district court did not err in awarding only $75,000 in consequential damages because Truform provided unreliable evidence to support its claim for consequential damages. Finally, American Axle argues that if damages were correctly awarded, then the district court used the correct interest rate because Michigan law governed the formation of the implied contract.

Truform argues that insofar as the issue of the existence of a contract with American Axle is concerned, the district court got it right; that Truform's conduct combined with American Axle's conduct demonstrated the parties' mutual intention to be in a direct contractual relationship with

one another. Truform posits that its agreement with GM was irrelevant; the critical relationship here was between Truform and American Axle. Truform concedes that it did not receive a purchase order for 1999 until it received one from American Axle in November, but maintains that a contract existed prior to that time. American Axle ordered parts, Truform shipped the parts, and American Axle paid Truform for the parts. The "secret agreement" between GM and American Axle, to which Truform was not a party, misled Truform into thinking that the entity ordering and using the parts would actually pay for them. Regarding the damages for breach of contract, Truform argues that the district court's awards were correct because American Axle failed to demonstrate that it was entitled to any costs. Truform argues that the district court erred, however, by awarding only $75,000 in consequential damages rather than the $129,558.62 Truform sought. Finally, although conceding that Michigan law governs the contract issues, Truform argues that under Ohio's choice of law rules, the district court should have used either the Ohio or New York rate of interest rather than the Michigan rate in calculating the prejudgment interest.

## V.

We begin our analysis with Michigan's codification of section 2–204 of the Uniform Commercial Code. That section states:

> A contract for sale of goods may be made in any manner sufficient to show agreement, including *conduct by both parties which recognizes the existence of such a contract.*

Mich. Comp. Laws Ann. § 440.2204(1) (emphasis added). Michigan also has codified the definition of "agreement" found in the UCC. An "agreement" is

> the bargain of the parties in fact as found in their language or by implication

from other circumstances including course of dealing or usage of trade or course of performance....

Mich. Comp. Laws Ann. § 440.1201(3) (West 1994 & Supp.2003).

The district court's conclusion that Truform and American Axle had an implied contract is a finding of fact we review for clear error. In support of its conclusion that Truform and American Axle showed a mutual intention to act, the district court recounted at length the parties' conduct during the months in question. Specifically, the district court described American Axle's requests and demands for parts as revealed in the constantly changing shipping schedules it sent to Truform. American Axle's employees were in direct contact with Truform's employees. Consequently, Truform was aware of and tried to meet American Axle's expectations for supplies. The implied contract between the parties was simple; its essential terms were that American Axle would order parts and Truform would deliver parts. We think the district court's conclusion that the parties' conduct "recognize[d] the existence of ... a contract" was not clearly erroneous. Mich. Comp. Laws Ann. § 440.2204(1).

American Axle argues that despite the absence of a purchase order from GM to Truform in 1999, Truform delivered parts and American Axle paid for parts as a result of their preexisting written contracts with GM, not because American Axle and Truform intended to be legally bound to one another. The district court did not directly address the significance of the preexisting written contracts, but we think it was not required to do so. The court's failure to make express findings regarding those documents does not warrant a reversal of the judgment because a complete understanding of the issues is

still possible. *See Grover Hill,* 728 F.2d at 793. We have long recognized that if, from the findings of fact, other facts may be inferred in support of the judgment, we deem those inferences to have been drawn by the district court. *Id.* Based on its holding that American Axle and Truform had an implied contract in 1999, the district court implicitly found that in 1999, Truform was no longer acting pursuant to its written contract with GM. Like the district court, we note that GM continued to issue purchase orders to Truform after selling the plant to American Axle, but did not issue one in 1999. Even if there were two permissible ways to view the evidence, the district court's decision to view the evidence in one of those ways as opposed to the other was not clear error. *See MX Group,* 293 F.3d at 331.

■ Both parties claim that the district court erred when it awarded damages for breach of the implied contract. American Axle sought to recover costs of $1,803,550.69. However, the district court stated:

> Even though American Ax[le] indicated it was constantly in fear of shutting down General Motors production lines due to the problems it was encountering with Truform, the fact is that no shut down ever occurred. The only damages that American Ax[le] has demonstrated is receipt of nonconforming parts for which American Ax[le] has not received any credit.

Although American Axle developed its own calculation of costs from untimely deliveries, it could not demonstrate that it was actually damaged in any way. A court may find that a contract has been breached, but that damages have not been shown and accordingly should not be awarded. *See Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 43 F.3d 1054, 1059–60 (6th Cir.1995). The district court's finding that American Axle did not suffer

damages supports its decision not to award any recovery for so-called containment costs. We will not disturb the court's refusal to award damages because "[i]f the district court's findings are sufficient to indicate the factual basis for its ultimate conclusion, in light of the record viewed in its entirety, then it is not clearly erroneous." *Amantea–Cabrera v. Potter,* 279 F.3d 746, 750 (9th Cir.2002).

■ Under similar reasoning, we decline to overturn the district court's award to Truform of $75,000 in consequential damages, despite Truform's argument that it was entitled to $129,558.62. The question is whether the award of $75,000 was clearly erroneous. In calculating consequential damages, the district court carefully considered evidence concerning parts that were not shipped, rubber that was not used, and specific materials that were not needed. We are not "left with the definite and firm conviction that a mistake has been committed." *Bank of Lexington,* 959 F.2d at 609 (internal quotation marks and citations omitted).

■ The district court correctly applied the Michigan rate to calculate the prejudgment interest. In diversity cases, state law governs an award of prejudgment interest. *FDIC v. First Heights Bank, FSB,* 229 F.3d 528, 542 (6th Cir.2000). In *First Heights,* a federal district court in Michigan tried a breach of contract action under Texas law. We concluded that the district court properly considered the Texas rate, rather than the Michigan rate, to determine the prejudgment interest on the damages awarded for breach of contract. *Id.* at 542–43. The circumstances in *First Heights* directly parallel the circumstances in this case, and accordingly, we reach a parallel conclusion. The district court did not err when it used the Michigan rate, rather than the Ohio rate, to calculate the prejudgment interest.

## VI.

■ The district court rejected American Axle's primary breach of contract counterclaim. In doing so, the district court refused to enforce against Truform the terms of GM's agreement with American Axle. The court pointed out that Truform had no knowledge of the agreement. American Axle argues that it could assert a claim against Truform because it had been assigned GM's contract rights and that Truform breached its warranties by delivering defective parts and failing to make timely deliveries. In response, Truform states that it could not have made any express or implied warranties to American Axle because it was unaware of the agreement between American Axle and GM. Moreover, even if there were enforceable warranties, American Axle could not establish that it was entitled to damages for breach of warranty. Truform maintains that American Axle cannot enforce a "secret agreement."

Michigan has adopted the UCC approach to the assignment of contractual rights pertaining to the sale of goods:

> Unless otherwise agreed all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on the other party by that other party's contract, or impair materially the other party's chance of obtaining return performance.

Mich. Comp. Laws Ann. § 440.2210(2) (West 1994 & Supp.2003) (emphasis omitted).

Michigan also follows the UCC provisions governing express and implied warranties. Express warranties are created by an affirmation, promise, description, or sample. Mich. Comp. Laws Ann. § 440.2313. There is an implied warranty that goods are fit for a particular purpose when the seller knows the purpose for which the goods are required and the buyer is relying on the seller's skill or judgment to furnish suitable goods. Mich. Comp. Laws Ann. § 440.2315.

American Axle claims it was entitled to damages because it was assigned GM's right to recover from Truform if Truform breached a warranty. However, the district court concluded that the evidence was insufficient to show that any warranty had been breached. This is essentially a question of damages, and as discussed previously, the district court's factual findings regarding damages are reviewed for clear error. See Amantea–Cabrera, 279 F.3d at 750. American Axle has not presented evidence sufficient to leave us "with the definite and firm conviction that a mistake has been committed" in the award of damages. Bank of Lexington, 959 F.2d at 609 (internal quotation marks and citations omitted). Furthermore, American Axle has not argued, nor do the facts reveal, that a novation gave GM's rights against Truform to American Axle. A novation is a "substituted contract." Restatement (Second) of Contracts § 280 (1981). American Axle's agreement to manufacture parts for GM did not take the place of GM's separate agreement to order parts from Truform.

## VII.

■ The district court held that American Axle expressly waived its right to cost recoveries from Truform because American Axle ceased sending cost notices and failed to follow the procedures for obtaining a setoff. American Axle challenges the district court's conclusion by pointing out that it stopped sending notices only because Truform stated that it could not pay; thus, American Axle had no choice other than to stop sending the notices. The parties dispute whether their course of conduct constituted a waiver by American

Axle. They also dispute whether American Axle complied with its own formal notification and recovery procedures. Truform specifically points out that American Axle never debited any costs to Truform while it compiled its containment cost data.

The Supreme Court of Michigan has explained "waiver" as

> the intentional relinquishment of a known right. The usual manner of waiving a right is by acts which indicate an intention to relinquish it, or by so neglecting and failing to act as to induce a belief that it was the intention and purpose to waive.

*Book Furniture Co. v. Chance,* 352 Mich. 521, 90 N.W.2d 651, 655 (Mich.1958) (citations omitted).

The district court made three factual findings regarding waiver: (1) American Axle did not follow the procedures for obtaining cost recoveries set forth in the Supplier Quality Processes and Measurements Procedure; (2) American Axle made a business decision to cease issuing cost recoveries and it communicated this decision to Truform; and (3) the submission of the cost recoveries to Truform was employed for negotiating purposes in an attempt to reduce American Axle's debt to Truform.

The first finding of fact, that American Axle did not follow the written procedures, is not clearly erroneous; in fact, it is not erroneous at all. American Axle never debited the costs to Truform, which the document explicitly mandated. The district court's remaining findings are based primarily on the testimony of witnesses, specifically, the American Axle employees who testified that the cost recoveries were a "negotiating tool." We must defer "to the opportunity of the trial court to judge of the credibility of the witnesses." Fed. R.Civ.P. 52(a). The district court emphasized that American Axle's decision to stop sending containment cost notices to Tru-

form indicated to Truform that American Axle was relinquishing any right it had to recovery. Moreover, the fact that American Axle continued to calculate costs but neglected to inform Truform of its data "induce[d] a belief that it was [American Axle's] intention and purpose to waive" the imposition of those costs as a setoff against amounts due. *Book Furniture Co.,* 90 N.W.2d at 655. We cannot say that the district court clearly erred in concluding that American Axle waived its right to a setoff.

## VIII.

Truform asserted a claim for fraud, alleging that: (1) American Axle represented it would not assess cost recoveries; (2) Truform shipped parts in reliance on those representations; and (3) American Axle always intended to hold Truform liable for containment costs. Truform also claims that it was entitled to damages for economic duress because American Axle forced it to incur expenses involuntarily. Truform argues that it had no choice but to accept American Axle's shipping demands. American Axle argues in response that it ordered the parts from Truform because it was under pressure from GM to perform its own manufacturing obligations. Additionally, Truform could have declined to ship the parts to American Axle because there was no purchase order from GM in place for 1999.

In its decision, the district court did not indicate whether it applied Michigan law or Ohio law to Truform's claims for fraud and economic duress. On the fraud claim, the elements are essentially the same in the two states. In Ohio, the elements of fraud are:

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowl-

edge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*State ex rel. The Illuminating Co. v. Cuyahoga County Court of Common Pleas,* 97 Ohio St.3d 69, 776 N.E.2d 92, 97–98 (Ohio 2002) (internal quotation marks and citations omitted). In Michigan, the elements of fraud are:

(1) [t]hat defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

*Kassab v. Michigan Basic Prop. Ins. Ass'n,* 441 Mich. 433, 491 N.W.2d 545, 548 (Mich.1992) (internal quotation marks and citations omitted).

■ In rejecting Truform's fraud claim, the district court found that American Axle was placed in a difficult position because it had problems with Truform's products, but its contract with GM prevented it from using another supplier. Truform could not establish the elements of fraud because the evidence did not show that American Axle knowingly made false promises or intended to mislead Truform. The district court made the additional finding that Truform had its own production problems, unrelated to its dealings with American Axle. Thus, the causation element was missing as well.

The elements of economic duress in Ohio are

(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party.

*Blodgett v. Blodgett,* 49 Ohio St.3d 243, 551 N.E.2d 1249, 1251 (Ohio 1990) (internal quotation marks, citations, and emphasis omitted). "It is not enough to show that one [party] assented merely because of difficult circumstances that are not the fault of the other party." *Id.* at 1251–52.

To succeed on a claim of economic duress under Michigan law, a plaintiff must show that it was illegally compelled or coerced to act by fear of serious injury to its reputation or fortunes. *Norton v. Michigan State Highway Dep't,* 315 Mich. 313, 24 N.W.2d 132, 135 (Mich.1946); *Farm Credit Servs. of Michigan's Heartland, P.C.A. v. Weldon,* 232 Mich.App. 662, 591 N.W.2d 438, 447 (Mich.Ct.App.1998). However, the plaintiff's fear of financial ruin alone is insufficient to establish economic duress; the plaintiff must also establish that the entity applying the coercion acted unlawfully. *Farm Credit Servs.,* 591 N.W.2d at 447.

■ The district court rejected Truform's claim of economic duress because the court was not convinced that Truform was deprived of its will by American Axle's attempts to impose cost recoveries. The district court noted, and Truform does not dispute, that Truform always had the ability to cease shipping parts to American Axle. Truform had no written obligation to ship to American Axle at the beginning of 1999. Therefore, Truform was not left with "no other alternative." *Blodgett,* 551 N.E.2d at 1251. Moreover, Truform's difficult circumstances, including the fact that the majority of its business came from American Axle's orders, was not American Axle's fault. Accordingly, Truform cannot

show economic duress under Ohio law. The district court also concluded that Truform's concern that it might go out of business was insufficient to establish economic duress under Michigan law. *See Farm Credit Servs.*, 591 N.W.2d at 447. We find no error in the district court's findings of fact or conclusions of law regarding Truform's claims.

## IX.

For the foregoing reasons, we AFFIRM the district court's judgment, including its award of damages to Truform, and its calculation of prejudgment interest.