NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0678n.06

Nos. 10-6258/10-6507

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jun 25, 2012*

LEONARD GREEN, Clerk

JACK HENRY & ASSOCIATES, INC., )
)
    Plaintiff-Appellee Cross-Appellant, )
)
v. )
)
BSC, INC., )
)
    Defendant-Appellant Cross-Appellee. )

ON REVIEW FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

Before:    **KEITH, MARTIN, and BOGGS, Circuit Judges.**

**PER CURIAM.** Appellant BSC, Inc. ("BSC") appeals the district court's denial of its motion for judgment as a matter of law and its motion for a new trial. As a cross-appellee, it argues that the district court erroneously awarded and improperly calculated prejudgment interest. Appellee and cross-appellant Jack Henry & Associates, Inc. ("Jack Henry"), for its part, asserts that the district court erred in its award of postjudgment interest. For the reasons that follow, we affirm each of the district court's rulings.

## BACKGROUND

This is a breach of contract case. Jack Henry, a software developer and bank service-provider, filed a complaint alleging breach of contract against BSC. Under the Electronic Funds Transfer Agreement ("EFTA" or "contract") into which the parties entered, Jack Henry promised to process ATM and debit transactions for customers of several banks serviced by BSC, formerly

known as First Corbin Data. BSC terminated the contract prematurely and refused to pay an early-termination fee. Jack Henry sued to recover that fee.

BSC counterclaimed, alleging that Jack Henry's products and services were defective and fell below industry standards. As a defense to Jack Henry's claims, BSC asserted that it was not the real party in interest because it did not sign the EFTA. The EFTA identifies BSC by its former name, First Corbin Data; BSC's president signed a modification to the EFTA; and First Corbin Bancservices (not First Corbin Data) executed the EFTA.

At trial, Jack Henry presented testimony regarding the ATM and debit transaction processing industry. This included one of Jack Henry's experts, Suzanne Savage ("Savage"), who offered testimony, in relevant part, about industry standards. It also included testimony about the relationship between Jack Henry, BSC, and First Corbin Bancservices.

At the close of Jack Henry's case, BSC moved for judgment as a matter of law on two grounds relevant to this appeal. First, it argued that Jack Henry could not recover under the EFTA because it did not prove performance in accordance with industry standards. Second, it argued that Jack Henry had not proved its case against BSC because BSC did not sign the EFTA. The district court reserved ruling on both arguments.

BSC then rested its case without introducing evidence. As a result, Jack Henry moved for judgment as a matter of law on all of BSC's counterclaims, including its claim that Jack Henry's services and products were defective. The district court dismissed BSC's counterclaims.

As jury instructions were discussed, BSC repeatedly asserted its position that it was not a party to the EFTA and requested an instruction addressing the factual question of which entities were

2

parties to the contract. Ultimately, the jury was presented with the following questions, which we paraphrase for clarity's sake:

- Do you find by a preponderance of the evidence that Jack Henry fulfilled its obligations under the EFTA?
- Which defendants do you find by a preponderance of the evidence were parties to the EFTA?
- Do you find by a preponderance of the evidence that either defendant breached the EFTA and that the breach caused injury to Jack Henry?

The jury decided in Jack Henry's favor, finding that Jack Henry performed its obligations under the EFTA, that both First Corbin Bancservices and BSC were parties to the EFTA, and that BSC breached the EFTA. BSC then renewed its motion for judgment as a matter of law. It also moved for a new trial, claiming that the district court had erroneously excluded the testimony of one of its experts, Dr. Andrew Cobb ("Cobb"). The district court denied BSC's motions. This appeal followed.

## DISCUSSION

### I. BSC's motion for judgment as a matter of law

BSC asserts that it is entitled to judgment as a matter of law on two grounds. The first ground concerns whether BSC is a party to the EFTA, and includes three arguments: (i) BSC never waived its statute-of-frauds defense; (ii) the record evidence does not satisfy the statute of frauds; and (iii) the EFTA bars Jack Henry's recovery. The second ground concerns whether Jack Henry was entitled to a favorable verdict where, BSC argues, it produced insufficient evidence of industry standards. We address BSC's arguments in turn.

3

We review a district court's denial of a motion for judgment as a matter of law de novo. *Noble v. Brinkler Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004). Where, as here, a court's jurisdiction is founded on diversity of citizenship, we apply "the standard of review used by the courts of the state whose substantive law governs the action." *Morales v. Am. Honda Motor Co. Inc.*, 151 F.3d 500, 506 (6th Cir. 1998). In this case, Missouri law governs the standard of review. Under Missouri law, judgment as a matter of law is appropriate when the plaintiff has not made "a submissible case," i.e., has not presented "substantial evidence for every fact essential to liability." *Erdman v. Condaire, Inc.*, 97 S.W.3d 85, 88 (Mo. Ct. App. 2002); *see Giddens v. Kansas City S. Ry. Co.*, 29 S.W.3d 813, 818 (Mo. 2000) (en banc). In assessing the evidence, we make all reasonable inferences in the light most favorable to the plaintiff, and should not overturn a jury verdict "unless there is a complete absence of probative facts to support it." *Id.*

A. *Determining the parties to the Agreement*

    1. Waiver of the statute of frauds

Missouri's statute of frauds provides, in relevant part, that "an agreement that is not to be performed within one year from the making thereof" is not enforceable "unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and *signed by the party to be charged*." Mo. Rev. Stat. § 432.010 (emphasis added). Although the statute of frauds is a state-law defense, whether it was waived is a question of federal law. *See Montgomery v. Wyeth*, 580 F.3d 455, 468 n.7 (6th Cir. 2009) (stating that, in diversity actions, state law defines "the nature of defenses" while federal law governs "procedural rules"); *see also Morgan*

*Guar. Trust Co. v. Blum*, 649 F.2d 342, 344 (5th Cir. 1981). Thus, federal law and the Federal Rules of Civil Procedure determine whether BSC has waived its statute-of-frauds defense.

Federal Rule of Civil Procedure (50)(a)(2) requires that a motion for judgment as a matter of law "specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). A post-verdict motion for judgment as a matter of law "may not advance additional grounds that were not raised in the pre-verdict motion." *Kusens v. Pascal Co. Inc.*, 448 F.3d 349, 361 (6th Cir. 2006). And judgment as a matter of law "is not available at anyone's request on an issue not brought before the court prior to submission of the case to the jury." *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 160 (6th Cir. 1997).

BSC argues that it preserved its statute-of-frauds defense by using language from the statute in its pre-verdict motion for judgment as a matter of law. This, it argues, put Jack Henry and the court "on notice" of its statute-of-frauds defense. Specifically, BSC stated that the EFTA was "signed by the party to be charged," i.e., *not* by BSC. It also argues that its pre-verdict motion should be construed liberally in light of the rule's purposes. We disagree.

BSC never actually raised the statute of frauds in its pre-verdict motion or otherwise at trial, and thereby waived that defense. Indeed, by the trial's conclusion, the statute was specifically mentioned only twice: once in BSC's Answer and Counterclaims, and once by the court. The latter occurred after BSC rested, during discussions regarding BSC's motion for a directed verdict on the basis that it was not a party to the EFTA. During a colloquy between the district court and Jack Henry's counsel, the court asked whether the EFTA was subject to the statute, and counsel for Jack Henry acknowledged that it was. Notably, BSC did not attribute what it now characterizes as a

5

quotation of the statute *to* the statute. There is a difference between merely using words from a law and actually making arguments that reference and rely on that law and case law. Further, there are two statutes of frauds in Missouri—one for sales under the Uniform Commercial Code ("UCC"), Mo. Rev. Stat. § 400.2-201, and one for all other transactions, *id.* § 432.010. The statute of frauds governing UCC sales contains three exceptions that the general statute lacks, including for specially-manufactured goods, partial payment and performance, and acknowledgment of a contract in pleadings or testimony in court. § 400.2-201(3). Because it failed to mention or cite the statute of frauds in general, much less which of the two Missouri statutes it purportedly relied upon, we think it is clear that BSC's failed to "specify . . . the law and facts" entitling it to judgment. Fed. R. Civ. P. 50(a)(2).

Whether BSC's pre-verdict motion should nevertheless be liberally construed as having put the court and opposing counsel "on notice" of its would-be statute-of-frauds defense is a closer call. "Although Rule 50(a) requires a motion for judgment as a matter of law to state its 'specific grounds,' the rule does not define how specific the grounds must be." *Kusens*, 448 F.3d at 361 (citing *Anderson v. United Tel. Co. of Kansas*, 933 F.2d 1500, 1504 (10th Cir. 1991)). "Because the requirement that a Rule 50(a) motion precede a Rule 50(b) motion is 'harsh in any circumstance,'" a Rule 50(a) motion should be reviewed in light of the rule's purpose: to secure a just, speedy, and inexpensive determination of the case, and to provide notice to the court and opposing counsel of any deficiencies in the opposing party's case before sending it to the jury. *See Kusens*, 448 F.3d at 361. "Accordingly, where Rule 50(a)'s purpose . . . has been met, courts usually take a liberal view of what constitutes a pre-verdict motion sufficient to support a post-verdict motion." *Id.* Phrased

6

differently, where there is notice, a somewhat vague pre-verdict motion may nevertheless preserve an argument for a post-verdict motion. *See id.*

*Kusens*—a case on which BSC relies—is illustrative but, ultimately, does not help BSC. In *Kusens*, we found a judgment not withstanding the verdict properly granted where Defendant's pre-verdict motion "was a general argument made orally that [the] plaintiff failed to argue his public policy claim, at all." *Id.* at 362. Counsel for the defense stated, "The public policy claim was not argued, not mentioned in the opening statement. Therefore, at that point in time, I was actually entitled to make a directed verdict [motion] . . . and . . . I am doing that at this point now, because there's been no reference to it in this case." *Id.* at 362-63 (alterations in original). The district court "expressly acknowledged" that Defendant was correct and there had been "no argument regarding the public policy claim." *Id.* at 354 (alteration omitted). Defendant's post-verdict motion, "which was made in writing and was fully briefed, presented the failure to establish a public policy claim with specificity." *Id.* at 362. Upon considering these facts, we found that "[d]efense counsel's argument and the court's on-the-record statements and ruling were sufficient to alert Plaintiff to the evidentiary insufficiency alleged by Defendant—his failure to plead and prove his cause of action." *Id.* at 363. It was "a close question," but we nevertheless found "no error" in the district court's conclusion that Defendant's pre-verdict motion sufficiently preserved the issue raised in its post-verdict motion. *Id.*[1] Yet *Kusens* does not help BSC: even if BSC need not use technical specificity

[1] The *Kusens* Court relied on the Eighth Circuit case *Rockport Pharmacy, Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195 (8th Cir. 1995). In *Rockport Pharmacy*, the defendant presented "only a generalized no-duty-of-care argument" in its pre-verdict motion and, in its post-verdict motion, made the same argument with "specificity." *Kusens*, 448 F.3d at 362. The Eighth Circuit found that

in its pre-verdict arguments, *Kusens* shows that it must at least *make* an argument, even a general one. Like *Kusens*, this case arguably is a close call; but the closest BSC's pre-verdict motion came to making even a general argument was using a bit of language that appears in two similar statutes, i.e., that the EFTA was "signed by the party to be charged," not by BSC. This did not put the court and Jack Henry on notice regarding a defense tied to one of the state's two statutes of frauds, and without notice, "technical noncompliance" need not be excused. *Kusens*, 448 F.3d at 361.

BSC also directs this court to an Eastern District of New York case in support of its "notice" argument, *Hamptons Locations, Inc. v. Rubens*, 640 F. Supp. 2d 208, 212-13 (E.D.N.Y. 2009), but that case is distinguishable and non-controlling. In *Hamptons Locations*, the district court found that the defendant had, in fact, put the parties on notice for the purposes of a Rule 50(b) motion where it "explained its position in detail following the presentation of Plaintiff's case-in-chief," "articulated several perceived inadequacies in Plaintiffs' proof," and "laid out his legal arguments." *Id.* at 213. Here, however, BSC rested after Jack Henry's case-in-chief and did not mention or cite either statute of frauds in its pre-verdict motion. We are thus unprepared to say that BSC described its statute of frauds defense in detail, articulated its case, and laid out its legal arguments.

_____

the general question of duty of care (raised in the pre-verdict motion) was "inextricably intertwined" with the specific question regarding the duty of care (raised in the post-verdict motion.) *Id.* at 362. As such, the later argument encompassed the earlier argument. *See id.* Just as in *Kusens*, however, the defendant in *Rockport Pharmacy* did, in fact, *make an argument,* including references to controlling law, in its pre-verdict motion, to wit: that under controlling law, there must be a duty of care owed to the plaintiff and that a mere breach of contract did not establish that duty. *See Rockport Pharmacy*, 53 F.3d at 197.

In light of the foregoing, we conclude that just as BSC's failure to cite the statute of frauds and argue it affirmatively resulted in a waiver of that defense, it also resulted in a lack of notice to the district court and Jack Henry.

2. Satisfying the statute of frauds and the EFTA as written

In addition to arguing that it preserved its statute-of-frauds defense, BSC argues that the record evidence does not satisfy the statute anyway. BSC argues that it did not sign the EFTA, and that this alone is dispositive because the statute requires contracts to be signed by the party to be charged. BSC further asserts that documents outside the EFTA cannot be used to satisfy the statute because, since BSC struck its name and changed the signatory to First Corbin Data before Jack Henry signed the contract, the contract "clearly" shows that BSC was not a party. Its arguments are meritless and we reject them.

"To satisfy the statute of frauds, it is not essential that a writing be a single document." *In re Estate of Looney*, 975 S.W.2d 508, 515 (Mo. Ct. App. 1998). "Instead, the agreement may be contained in separate writings when the separate writings, taken together, meet the requirements of the statute." *Id.* (internal quotation and citation omitted). The separate writings "need only be connected either by express reference to one another or by clear implication established through their respective contents." *Id.*

In this case, there are at least three documents that, taken together and in context, satisfy the statute: (i) the EFTA; (ii) the termination letter; and (iii) the Deconversion Agreement, in which Jack Henry agreed to assist BSC in switching its processing to software owned by another vendor. The EFTA itself memorializes the terms of the agreement. Although BSC did not sign the EFTA, BSC

9

did sign two other documents that specifically acknowledge that BSC was a party to the EFTA. The first sentence in the Deconversion Agreement recites: "Whereas, Jack Henry & Associates, Inc. (JHA) and BSC INC. formerly FIRST CORBIN DATA, 2400 S. MAIN ST, CORBIN KY 40701 (Client) *entered into an Electronic Funds Transfer Processing Services Agreement . . . .*" The termination letter begins with a similar acknowledgment, and is written on BSC stationary. Mark Terry, President of BSC, signed both the Deconversion Agreement and the termination letter. These documents show that the parties understood the contractual relationship with Jack Henry to extend, in relevant part, to BSC.

We also conclude that, because the EFTA was ambiguous, the court properly admitted extrinsic evidence, and a reasonable jury could conclude from that evidence that BSC was a party to the agreement. Under Missouri law, a contract is ambiguous "if its terms are susceptible to more than one meaning so that reasonable persons may fairly and honestly differ in the their construction of the terms." *PlaNet Prods. v. Shank*, 119 F.3d 729, 731-32 (8th Cir. 1997). "In construing ambiguous contracts the objective is to ascertain and render effective the mutual intent of the parties." *Busch & Latta Painting Corp. v. State Highway Com.*, 597 S.W.2d 189, 197-98 (Mo. Ct. App. 1980) (quotation and citation omitted). To that end, we consider "the entire contract, subsidiary agreements, the relationship of the parties, the subject matter of the contract, the facts and circumstances surrounding the execution of the contract, the practical construction the parties themselves have placed on the contract by their acts and deeds, and other external circumstances which cast light" on the parties' intent. *Id.* at 198 (quotation marks and citation omitted).

10

There was no error in considering extrinsic evidence because the EFTA is ambiguous regarding whom it binds. The EFTA identifies BSC by its former name, First Corbin Data; BSC's president signed a modification to the EFTA; and First Corbin Bancservices (not First Corbin Data, the name under which BSC formerly did business) executed the EFTA. Because "the contract [was] ambiguous, and extrinsic evidence [was] proper, . . . construction of the agreement [was] for the jury under proper instructions from the court." *Id.* (internal quotation marks omitted). Making all reasonable evidentiary inferences in Jack Henry's favor—as we must—we conclude that a jury could find BSC was a party to the contract. We therefore cannot say that there is "a complete absence of probative facts to support" the jury's conclusion. *Erdman*, 97 S.W.3d at 88.

*B. Industry Standards*

BSC next argues that Jack Henry failed to establish that it provided processing services under the EFTA that were consistent with industry standards.[2] To prevail on its breach of contract claim against BSC, Jack Henry indeed must prove that it "performed in accordance with the terms of the contract," *S. G. Adams Printing & Stationary Co. v. Cen. Hardware Co.*, 572 S.W.2d 625, 629 (Mo. Ct. App. 1978), i.e., in conformity with industry standards. As BSC's argument goes, Jack Henry failed to introduce sufficient evidence to establish the applicable industry standards, and there was thus no way for the jury to determine that Jack Henry's performance was consistent with those standards. We find BSC's argument unpersuasive.

---

[2]As a preliminary matter, what an industry standard is, and whether a party performed in conformity with that standard, are questions of fact for the jury. *See Kveragas v. Scottish Inns, Inc.*, 733 F.2d 409, 414 (6th Cir. 1984) ("The factfinder may also consider . . . compliance with the industry standard, if such a standard exists and is found to be reasonable.")

As an initial matter, BSC erroneously places the burden of proof on Jack Henry. In the "Warranties" section of the EFTA, Jack Henry promised "to provide the Processing Services . . . in a competent manner consistent with industry standards."[3] Under Missouri law, breach of warranty is either a counterclaim or an affirmative defense that the defendant—BSC—must plead and prove. *See Kallenbach v. Varner*, 502 S.W.2d 446, 448 (Mo. Ct. App. 1973). It is unclear whether BSC deemed Jack Henry's alleged failure to perform in compliance with industry standards a defense or a counterclaim: In its Answer and Counterclaims, BSC asserts as a defense that Jack Henry breached the contract, and as a counterclaim that Jack Henry "made express and implied warranties in the agreements that the products and services would be fit for the use intended." In any event, BSC ultimately chose to abandon its counterclaims, resting after Jack Henry presented its case. The district court subsequently dismissed BSC's counterlcaims, and so BSC has effectively waived its opportunity to treat the alleged breach as a counterclaim. Even assuming, however, that BSC's breach argument was a defense, its argument is unavailing because, as stated above, under Missouri law, BSC bears the burden of showing that Jack Henry breached the warranty. Though Jack Henry was required to show "performance" to recover, it was incumbent upon BSC to prove the industry standard (from which breach of warranty could be determined). As such, we reject its assertion that it should be granted judgment as a matter of law because Jack Henry did not prove the industry standard.

---

[3]The parties' intent "is presumed to be expressed by the natural and ordinary meaning of the language in the contract." *Parker v. Pulitzer Publ'g Co.*, 882 S.W.2d 245, 249 (Mo. Ct. App. 1994). Thus, there is no reason to conclude that the foregoing provision was *not* a warranty.

But even if Jack Henry had borne that burden, it introduced sufficient evidence from which a jury could discern the industry standard and also determine that Jack Henry performed consistent with that standard. BSC's primary argument on this issue is that Jack Henry did not meet its burden (which, as discussed above, was actually BSC's burden for all intents and purposes) because Savage, Jack Henry's expert, relied on data she obtained from Jack Henry, measured Jack Henry's performance against a similar company's operating rules, and conceded on cross-examination that there are no "unanimous standards," such as those created by trade groups. But determining what the industry standard is and whether it has been violated are questions for the jury. *See Kveragas*, 733 F.2d at 414. A jury could deduce an industry standard from testimony based on the practices of individual companies within the industry.[4] That Savage conceded that her opinion was not based on a formalized, industry-wide standard goes only to the weight of her evidence. Based on its verdict in this case, the jury clearly found it sufficient.

What is more, the jury could have concluded that, even if Jack Henry did breach the contract by failing to meet industry standards, the breach was not material. *See Guidry v. Charter Commc'ns,*

---

[4] BSC cites multiple cases for the proposition that industry standards must be adopted by the industry as a whole or else are invalid. None of the cases is jurisdictionally controlling, and none is analogous enough to be useful. Indeed, the majority of them are *Daubert* cases in which the court excluded expert testimony as unreliable because, among other reasons, the expert did not base his or her opinion on identifiable industry standards. *See Daubert v. Merrel Dow Pharm., Inc.*, 509 U.S. 579 (1993). But whether an expert's testimony is reliable under *Daubert* is a different question from whether a jury could reasonably deduce an industry standard from the evidence before it. The cases are even less persuasive when viewed through the lens of appellate review, where this court should only overturn the jury's decision if, drawing all "reasonable inferences" from the evidence in the light most favorable to Jack Henry, there is a "complete absence of probative facts" to support that decision. *Erdman*, 97 S.W.3d at 88.

13

*Inc.*, 269 S.W.3d 520, 531 (Mo. Ct. App. 2008) ("Whether a breach is material . . . is a question of fact" for the jury.). Under Missouri law, only a material breach would preclude Jack Henry from recovering against BSC. *See id.* Thus, even if the jury found a breach, it would not necessarily prevent Jack Henry from prevailing. This is yet another reason why we decline to disturb the jury's verdict.

For the foregoing reasons, viewing the "evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff," it is difficult if not impossible to say that "there is a complete absence of probative facts to support" the jury's conclusion that Jack Henry's performance was consistent with industry standards. *Erdman*, 97 S.W.3d at 88.

## II. BSC's motion for a new trial

After the jury verdict, BSC filed a motion for judgment as a matter of law or, in the alternative, for a new trial. BSC's theory regarding a new trial is that the district court improperly excluded its expert witness, Cobb. Specifically, it argues that Cobb's testimony was reliable based on his experience and education, his reliance on "best practices," and his consideration of alternate explanations for the various problems in Jack Henry's systems. We disagree.

We review a trial court's refusal to grant a motion for a new trial for an abuse of discretion. *See Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 405 (6th Cir. 2006). "Even if a mistake has been made, a new trial will not be granted unless the evidence would have caused a different outcome at trial." *Nida v. Plant Prot. Ass'n Nat'l*, 7 F.3d 522, 527 (6th Cir.1993).

The district court denied BSC's motion for a new trial, stating that it had "explained its reasons for excluding [Cobb's] testimony" in a previous order, and it "decline[d] to rehash this

14

already heavily-litigated issue." The previous order was issued after a hearing on Jack Henry's motion to suppress Cobb's testimony, at which the district court questioned Cobb extensively. Ultimately, the district court found that the *Daubert* factors weighed in favor of excluding Cobb's testimony. *See Daubert*, 509 U.S. 579.

When performing a *Daubert* analysis, a district court must "determine whether the evidence 'both rests on a reliable foundation and is relevant to the task at hand.'" *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 915 (6th Cir. 2009) (quoting *Daubert*, 509 U.S. at 597). Several factors bear on the reliability of expert testimony:

> (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a known or potential rate of error and the existence of standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance in a relevant scientific community.

*Mike's Train House*, 472 F.3d at 407. These factors are "neither definitive, nor exhaustive, and may or may not be pertinent to the assessment in any particular case." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). The inquiry is "flexible" and focuses "solely on principles and methodology, not on the conclusion that they generate." *Daubert*, 509 U.S. at 594-95. The proponent of the testimony bears the burden of proving admissibility, *Nelson*, 243 F.3d at 251 (citing *Daubert*, 509 U.S. at 592 n.10), and on appeal, we have instructed that the proffered evidence must also be outcome-determinative. *See Nida*, 7 F.3d at 527.

In granting Jack Henry's motion to exclude, the district court focused on four aspects of Cobb's reports prepared for the trail: (i) his definition of "defect"; (ii) his "criticality" scale; (iii)

15

whether Cobb considered alternative explanations for the problems about which he was opining; and (iv) his analysis and conclusions. Regarding Cobb's definition of "defect," the district court observed that Cobb's report did not define the term, and he provided no authoritative support for the definition he proffered at the hearing. Indeed, he defined a defect merely as a problem that Jack Henry corrected. Thus, his definition did not "distinguish between actual defects and actions taken by [Jack Henry] in response to customer complaints based on something other than a software defect." At the hearing, Cobb conceded that his definition had not been peer-reviewed. He also admitted that he did not use the sources he relied upon in his rebuttal report, including a leading book in the software field, in formulating his definition of "defect." Because it had not been subject to peer review, tested, or widely accepted in the scientific community, the district court determined that Cobb's definition of "defect" was unreliable under the *Daubert* inquiry.

Cobb's "criticality" scale, which he used to evaluate the seriousness of the alleged defects, also failed *Daubert.* First, Cobb admitted that it was not subject to peer review. Second, Cobb defined the scale as an "amalgamation of best practices from academia to different organizations," but BSC did not show that the combined methodologies themselves satisfied *Daubert.* When an "expert offers an opinion that is based on a combination of two methodologies, each methodology must meet the *Daubert* criteria, and the combined methodology must meet those criteria also." *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, No. 05-138, 2008 WL 113987, at *4 (E.D. Ky. Jan. 7, 2008) (citing *Elcock v. Kmart Corp.*, 233 F.3d 734, 748 (3d Cir. 2000)). Cobb's reports were silent as to the methodology that guided the development of his criticality scale. Thus, the district court reasoned, "even assuming that [Cobb] used multiple, independently-accepted

methodologies in drafting his report, [BSC has] failed to satisfy [its] burden of showing that [Cobb's] 'amalgamation' is reliable."   (*Id.* at *8) (citing *Elcock*, 233 F.3d at 748).

Regarding Cobb's failure to consider alternate explanations, the district court noted that the report only addressed "what he considered to be [Jack Henry-caused] defects.  It did not contain any alternate explanations for the alleged issues that [BSC] encountered" with Jack Henry's products.  At the hearing, Cobb also admitted that he did not consider alternate explanations for some of the issues.  The district court observed that the Federal Rules of Evidence instruct the court to consider "whether the expert has adequately accounted for obvious alternate explanations."  Fed. R. Evid. 702, Advisory Comm. Note.  Consideration of alternate explanations is not a *Daubert* factor, and BSC correctly notes that the test does not require an expert to take into account *all* alternate explanations.   But that does not mean the district court abused its discretion by considering factors that, though outside the strict confines of *Daubert*, are relevant to determining whether methodology is reliable: the *Daubert* factors are "neither definitive, nor exhaustive."  *Nelson*, 243 F.3d at 251. In light of the foregoing, the district court was within its discretion in finding that Cobb's report and testimony were "unreliable" because, among other things, he admitted that his methodology did not include consideration of alternatives, including user error, connectivity problems, and legitimate software problems.

Finally, the district court found that Cobb's analysis and four conclusions were unreliable. Cobb's first conclusion, that Jack Henry did not follow basic design and programming principles necessary for reliable transactions systems, was unreliable because his definition of "defect" and his criticality scale (on which the conclusion was based) were unreliable.  Cobb's second conclusion,

that Jack Henry's "system was not sufficiently tested . . . before deployment" was unreliable because Cobb "admitted at the hearing that he did not know what testing procedures [Jack Henry] actually used." *See Daubert*, 509 U.S. at 589-90 ("The subject of an expert's testimony must be 'scientific . . . knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation.") (alteration in original) (footnote omitted) (quoting Fed. R. Evid. 702). Cobb's third conclusion was that there were "systemic problems with the interface" between various Jack Henry products—but, the district court observed, he came to this conclusion "without even reviewing the design template for the interface." This opinion is not reliable because Cobb did not specifically identify any of the alleged problems with the interface in either of his reports. Cobb's fourth and final conclusion was that "fixes to the system were not sufficiently tested before they were deployed." But, as the district court pointed out, Cobb admitted not knowing what Jack Henry's testing procedures actually were.

The district court did not abuse its discretion, and so we need not determine whether the excluded testimony would have been outcome determinative. *Nida*, 7 F.3d at 527.

## III. Prejudgment interest

Following the jury verdict, the district court awarded Jack Henry prejudgment interest on its damages, calculated at a rate of 18% pursuant to its analysis under Missouri law.

BSC argues that, in so doing, the district court erred for three reasons: (i) Kentucky law should have governed because Kentucky was the "forum state"; (ii) Jack Henry's damages were not

liquidated; and (iii) the EFTA does not provide an 18% interest rate to prejudgment interest. We disagree.

We review a trial court's award of prejudgment interest for an abuse of discretion. *See Scotts Co. v. Garden & Pet Co.*, 403 F.3d 781, 788 (6th Cir. 2005).

A. *Governing Law*

The parties agree that "prejudgment interest is a substantive aspect of damages in a diversity case and is thus properly viewed as a matter of state law." *Diggs v. Pepsi-Cola Metro. Bottling Co.*, 861 F.2d 914, 924 (6th Cir. 1988) (quotation and citation omitted). But they disagree about which state's law applies. BSC contends that Kentucky law controls, citing our unpublished decision in *Willits v. Peabody Coal Co.*, Nos. 98-5458, 98-5527, 1999 U.S. App. LEXIS 21095 (6th Cir. Sept. 1, 1999), for the proposition that the "question of prejudgment interest in a diversity action is governed by the law of the forum state."

Jack Henry asserts that Missouri law applies because, when assessing prejudgment interest, courts look to the law of the state that governs the cause of action. *See FDIC v. First Heights Bank, FSB*, 229 F.3d 528, 542-543 (6th Cir. 2000)); *Truform Inc. v. GMC*, 80 F. App'x. 968, 975 (6th Cir. 2003). Because Missouri law governed the contract claim, it argues, it governs the prejudgment interest question, as well.

The case law does not address this issue head-on, but we find Jack Henry's argument persuasive. *Peabody*, on which BSC relies, is an unpublished opinion that discusses prejudgment interest in just two sentences. It relies on *Rhea v. Massey-Ferguson, Inc.*, 767 F.2d 266, 270 (6th Cir. 1985), which is factually distinguishable because, unlike here, there is no indication in *Rhea* that

19

the parties contractually agreed to be bound by the law of a given state, and then were so bound by the adjudication of their substantive claims.[5]

Our decision in *First Heights* (on which Jack Henry relies) indicates that courts look to the law of the state that governs the cause of action when assessing prejudgment interest. In that case, the law of the forum state was not the law that governed the cause of action, and we applied the law governing the action (Texas law) to the prejudgment-interest question. *First Heights*, 229 F.3d at 542-43. While *First Heights* did not state outright that its approach is the law, its approach is not only precedent, but also sensible: the parties agreed to be bound by Missouri law, and it would be strange indeed to carve out the issue of prejudgment interest and apply Kentucky law while Missouri law governs the rest of the case. Moreover, we have found no cases mandating such a result. We thus conclude that Missouri law governs the determination of prejudgment interest.

B. *Liquidation*

Under Missouri law, prejudgment interest is available for contract damages if those damages are liquidated, meaning they are "fixed and determined or readily ascertainable by computation or a recognized standard." *Jablonski v. Barton Mut. Ins. Co.*, 291 S.W.3d 345, 350 (Mo. Ct. App. 2009) (internal quotation marks omitted). Contract damages are not liquidated where calculating the damages would require "variable, speculative, and uncertain" estimates. *Children Int'l v. Ammon Painting Co.*, 215 S.W.3d 194, 204 (Mo. Ct. App. 2007). When an award of damages involves a

---

[5] Other cases seeming to articulate the *Peabody* principle are also factually distinguishable: neither *Diggs*, 861 F.2d at 924, nor *American Anodco, Inc. v. Reynolds Metals Company*, 743 F.2d 417 (6th Cir. 1984), nor *Clissold v. St. Louis-San Francisco Railway Company*, 600 F.2d 35 (6th Cir. 1979), addresses whether the parties agreed to be bound by the law of a given state.

liquidated amount, an award of prejudgment interest is mandatory. *Columbia Mut. Ins. Co. v. Long*, 258 S.W.3d 469, 480 (Mo. Ct. App. 2008).

The EFTA provides the formula for calculating the early-termination fee that the jury awarded Jack Henry. The fee equals "the average monthly billing exclusive of pass through cost . . . for the past twelve months multiplied by the number of months . . . remaining in the contract term." The EFTA also provides that the early-termination fee is "immediately due and payable" upon "receipt of [BSC's] intention to" terminate Jack Henry's processing services. Thus, at the time of BSC's breach, either party could have used the EFTA agreement and the billing records to determine the amount of the early-termination fee. It was therefore "readily ascertainable by computation" and, as such, liquidated. *Jablonski*, 291 S.W.3d at 350.

BSC argues that, the foregoing notwithstanding, its assertion of a counterclaim for breach of the EFTA means, ipso facto, that the claim was *not* liquidated. This is wrong: under Missouri law, if the amount of damages is readily ascertainable, then neither disputing liability nor filing a counterlcaim or a crossclaim renders the damages unliquidated. *See Jerry Bennett Masonry, Inc. v. Crossland Constr. Co.*, 171 S.W.3d 81, 90 (Mo. Ct. App. 2005) ("The mere fact that a party denied liability or defends a claim against him, or even the existence of a bona fide dispute as to the amount of the indebtedness, does not preclude recovery of interest."); *Bolivar Insulation Co. v. R. Logsdon Builders, Inc.*, 929 S.W.2d 232, 236 (Mo. Ct. App. 1996) ("[T]he fact that Owner interposed a crossclaim against Logsdon with respect to the amount owed did not render Lodsgon's claim unliquidated.").

C. *The EFTA's provisions*

BSC's final argument is that, even if an award of prejudgment interest is proper, it was error for the district court to use an 18% interest rate. That rate, it argues, applies only to outstanding charges for products and processing services, not to the early-termination fee. We disagree.

The EFTA provides the same interest rate for all payments, whether for products, services, early-termination fees, or anything else: 18%. Section 9 of the EFTA is entitled "Payments." It provides:

> Client agrees to pay upon presentation by [Jack Henry] of an electronic funds transfer debit for such amount, the then applicable charges for the Products covered thereby. Unless specified otherwise, all amounts are due when the Processing Services have been completed or other Products provided. [Jack Henry] shall provide an invoice to the Client for review prior to initiation of the electronic funds transfer debit. Set-up fees and annual fees will be invoiced and are payable in advance. Amounts outstanding after the due date are subject to an interest charge to date or payment of the lesser of 18% per annum or the highest legally allowable rate.

Thus, the "Payments" section of the EFTA discusses numerous types of payments, sometimes defining the payment and sometimes not. It mentions products, processing services, set-up fees, and annual fees—but it also discusses payment "amounts outstanding" in general. The most natural reading of the provision as a whole and the final sentence in particular is that it pertains, as it is labeled, to payments of whatever type. BSC asserts that "the early termination fee is addressed in an entirely different section of the EFTA," i.e., Section 3. That section indeed discusses the fee, but provides no interest rate. BSC seems to argue that *only* Section 3 applies where the fee is at issue, but the more reasonable reading of the contract is that Section 3 *and* Section 9 discuss the early-termination fee—the former in general, and the latter with regard to how that fee is treated under the contract's payment scheme.

In light of the foregoing, we affirm the district court's award and calculation of prejudgment interest on the early-termination fee.

## IV. Postjudgment interest

Following the jury's verdict, the district court awarded postjudgment interest at .22%, compounded annually, pursuant to 28 U.S.C. § 1961. On appeal, Jack Henry asserts that § 1961 does not apply, and that the interest rate should have been 18% (equivalent to the prejudgment interest rate under the EFTA). Jack Henry is wrong.

We review a district court's determination of postjudgment interest for an abuse of discretion, unless it raises an issue of statutory interpretation, in which case we review de novo. *See Scotts*, 403 F.3d at 788. Here, there is no question of statutory interpretation because the issue is whether the EFTA itself circumvents federal law.

The default rule is that, "in diversity cases in this Circuit, federal law [i.e., § 1961] controls postjudgment interest" even while state law governs awards of prejudgment interest. *Estate of Riddle v. S. Farm Bureau Life Ins. Co.*, 421 F.3d 400, 409 (6th Cir. 2005) (internal quotation marks omitted). Jack Henry asserts, however, that the parties can and did contract around § 1961 by including a Missouri choice-of-law provision. Under Missouri law, a contractual interest rate applies to judgments on the contract. *See Green Acres Enters., Inc. v. Freeman*, 876 S.W.2d 636, 641 (Mo. Ct. App. 1994); Mo. Rev. Stat. § 408.040. Thus, Jack Henry argues, it was entitled to 18% interest on the postjudgment award.

As with prejudgment interest, the case law is less than dispositive. We note, however, that at least one sister circuit directly addressed this issue, holding that federal law controls despite a bare

choice-of-law provision like the EFTA's. *See FCS Advisors, Inc. v. Fair Fin. Co.*, 605 F.3d 144, 148 (2d Cir. 2010) ("[A] general choice-of-law provision . . . does not alter the application of the federal rate to the calculation of [postjudgment] interest in diversity cases."). What is more, the weight of authority is that the federal rule applies unless the contract includes "language expressing an intent that a particular interest rate apply to judgments or judgment debts" that is "clear, unambiguous[,] and unequivocal." *Id*. at 148. In light of the foregoing, we conclude that the EFTA's bare choice-of-law provision is insufficient to replace the default rule. The settled principle that, under federal law, once a claim is "reduced to judgment, the original claim is extinguished and merged into the judgment" supports this result. *Kotsopoulos v. Asturia Shipping Co.*, 467 F.2d 91, 95 (2d Cir. 1972); *see also In re Reisbell*, 586 F.3d 782, 794 (10th Cir. 2009); *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 102 (2d Cir. 2004). Phrased differently, the EFTA's default contractual interest rate, without more, cannot govern the postjudgment interest rate because, upon reduction to judgment, the original claim no longer exists.

For these reasons, we affirm the district court's award and calculation of postjudgment interest.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment regarding BSC's motion for judgment as a matter of law, BSC's motion for a new trial, and prejudgment and postjudgment interest.