**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0529n.06

No. 08-2453

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 19, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| BERGIN FINANCIAL, INCORPORATED, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| FIRST AMERICAN TITLE COMPANY, | ) | |
| | ) | |
| Defendant-Appellee, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| A & S APPRAISAL GROUP, INCORPORATED; | ) | |
| ROBERT D. WILLEY; LINCOLN TITLE CO., et al, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

BEFORE: BOGGS, ROGERS, and COOK, Circuit Judges.

ROGERS, Circuit Judge. Bergin Financial, a mortgage company that was the victim of a

fraudulent "flipping" scam, sues First American Title Company, which provided title insurance for

the flip transactions. Bergin Financial does not assert any title defects. Rather, Bergin Financial

argues that Lincoln Financial, an independent agent for First American, knowingly engaged in the

fraudulent scam in its capacity as the closing agent for the transactions, and that First American

should be vicariously liable for Lincoln Financial's actions. The district court determined that acting

as a closing agent was outside the scope of Lincoln Financial's agency agreement with First

American and thus granted First American's motion for summary judgment. On appeal, Bergin Financial primarily contends that, under the theories of implied or apparent agency, Lincoln Financial was First American's agent for the purpose of closing the transactions at issue. Under Michigan law, however, implied agency cannot contradict the clear terms of agency agreements, and the agreement in this case explicitly limited the scope of Lincoln Financial's agency to issuing title insurance contracts. Because Bergin Financial has also not submitted sufficient evidence of apparent agency, First American was entitled to summary judgment.

First American Title Company is a title insurance company, and Lincoln Financial is an independent agent of First American for the purpose of issuing title insurance policies. The agency agreement between First American and Lincoln Financial provides,

> [First American] hereby appoints [Lincoln Financial] to act for, and in the name of, [First American] in transacting title insurance business, but only for the purposes and in the manner specifically set forth in this contract and for no other purpose and in no other manner whatsoever. The authority hereby granted is subject to all of the limitations on the scope of the Agency contained in this contract . . . .

The agency agreement lists only one grant of authority from First American to Lincoln Financial:

> [Lincoln Financial] is authorized to issue, in the name of [First American], title insurance commitments and policies (including endorsements thereto); [under certain conditions].

The agency agreement also grants First American the right to audit Lincoln Financial's escrow accounts for transactions in which First American title insurance policies are issued. The agency agreement further states,

> The right of [First American] to periodically inspect and audit [Lincoln Financial]'s escrow accounts and escrow files shall not be construed by [Lincoln

Financial] or any party dealing with [Lincoln Financial] as an undertaking on the part of [First American] to assume any responsibility or liability for the acts or any errors or omissions of [Lincoln Financial] in the performance of [Lincoln Financial]'s duties as an escrowee under any escrow agreement.

As part of its relationship with its independent closing agents, First American issues "Underwriting Alerts" and "Escrow Bulletins." One Underwriting Alert instructed recipients not to issue title insurance or close transactions involving certain parties. Another Underwriting Alert provided advice on how to avoid involvement in fraudulent flip transactions. The Escrow Bulletins asked recipients to contact First American if they were asked to close or insure a transaction involving any of a list of specified parties. First American sent these documents both to independent agents and to First American's employees who also issued insurance policies and performed closings.

Lincoln Financial was allegedly involved in two fraudulent schemes. The first took place between October 2001 and March 2002. In this first scheme (the "ABN Scheme"), Alan Schiffman originally owned the properties at issue, and Mary Kathryn DeCuir was his real estate agent. Schiffman sold the properties at a low price to Paul Dailey (operating through Monumental Investments), and Dailey—the "flipper" in the scheme—then sold the properties at inflated values to straw purchasers. The straw purchasers borrowed the money to finance the purchases from ABN AMRO Mortgage Group, Inc. (ABN), and the goal of the scheme was apparently for Dailey to receive the borrowed money based upon the inflated values and for the borrowers to default on the loans, defrauding ABN in favor of Dailey. For each property, the closings for both steps of the property transactions (Schiffman to Dailey, then Dailey to the straw purchasers) took place on the

same day, and Lincoln Financial's president, Kevin Bluhm, presided over the closings of these transactions. Dailey was eventually imprisoned for his role in this scheme.

Lincoln Financial first became aware of problems related to the ABN loans when ABN contacted Lincoln Financial to notify Lincoln Financial that it was being taken off ABN's list of approved title companies. In May 2002, representatives of the Federal Home Loan Mortgage Corporation (Freddie Mac) interviewed Lincoln Financial's president, Bluhm. The parties dispute when Lincoln Financial notified First American of ABN's action and the Freddie Mac investigation. Because the district court granted First American's motion for summary judgment, we view the facts in the light most favorable to Bergin Financial. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Viewed in that way, the facts suggest that Lincoln Financial notified First American of both ABN's decision to remove Lincoln Financial from ABN's list of approved title companies and the Freddie Mac investigation around May 10, 2002.

This case concerns the second fraudulent scheme in which Lincoln Financial was allegedly involved. The scheme involved a number of the same individuals, and it was structured in a similar way. The properties at issue in this second scheme were originally owned by the Stollman Entities, and DeCuir was the real estate agent representing those entities. In this scheme, Terry Barnes (acting through Omicron Development) was the flipper; Barnes purchased the properties at low prices from the Stollman Entities and then resold the properties at substantially higher prices to straw buyers. DeCuir allegedly convinced Robert Willey to appraise the properties at inflated values to support the high sales prices, often without Willey's visiting the properties. Lincoln Financial issued First

American title insurance for all of the transactions in this case, and Lincoln Financial's president, Bluhm, acted as the closing agent for these transactions. (Bluhm did not actually attend all of the closings.) The straw purchasers borrowed the money from Bergin Financial acting through loan officer Steve Kohn, who had met a confederate of Barnes while working as a part-time cashier at a gas station. Bergin Financial alleges that between May 21 and July 11, 2002, it issued 61 loans to finance the purchases related to this scheme, and that Bergin Financial has suffered millions of dollars in damages as a result of the non-payment of those loans.

Bergin Financial alleges in its brief that Lincoln Financial consulted with First American about how to deal with the transactions involving Barnes. Bluhm's testimony, however, was that he had, at a time he could not recall, asked First American generally about how to handle simultaneous closings. First American had responded by providing advice about what kinds of simultaneous closings should generate red flags. The evidence arguably supports a conclusion that Bluhm used this information to help conceal the fraudulent scheme. The claim by Bergin Financial that "First American, on notice of the illegitimacy of the transactions, nonetheless authorized its agent to close them and provided express guidance on how to do so" finds no support in the record.

As a result of the investigation related to the ABM Scheme, Freddie Mac placed Lincoln Financial on its "Exclusionary List" effective January 31, 2003. Freddic Mac based this action on its conclusion that Lincoln Financial "knew or should have known about the problems associated with the loans at issue [in the ABM scheme]." First American terminated its agency agreement with Lincoln Title in April 2003.

Bergin Financial filed suit in federal court against First American, Lincoln Financial, Bluhm, Willey and the appraisal company where Willey worked, Omicron, Barnes, DeCuir, the Stollman Entities, the straw buyers, and related parties. The complaint alleged breach of contract by Willey and his appraisal company; breach of contract by Lincoln Title and Bluhm; civil conspiracy by all of the defendants; common law fraud by all of the defendants; negligent misrepresentation by all of the defendants; Racketeering Influenced Corrupt Organization (RICO) violations under 18 U.S.C. §1962(c) by the Stollman Entities, the appraisal company, Omicron, Lincoln Title, First American, and two other defendants; and RICO violations under 18 U.S.C. §1962(d) by all of the defendants other than the individual straw buyers. The district court entered default judgments against a number of the defendants, including Lincoln Title and Barnes. The district court granted the summary judgment motion filed by defendants Willey and the appraisal company on the majority of the claims against them, and the district court dismissed the remainder of the claims against these defendants without prejudice.

The district court also granted First American's motion for summary judgment. The court determined that First American's liability was premised upon Lincoln Financial's acting as First American's agent for the purpose of closing the flip transactions, and the court found that Lincoln Title was not First American's agent for that purpose. The district court also concluded that Bergin Financial had not produced sufficient evidence of any direct, wrongful actions of First American, and thus determined that First American was not liable to Bergin Financial for Bergin Financial's

losses.  The district court dismissed without prejudice Bergin Financial's claims against all of the

remaining defendants, including Bluhm, the Stollman Entities, and the straw buyers.

Bergin Financial now appeals, arguing primarily that Lincoln Financial was acting as First

American's agent when it closed the fraudulent transactions at issue in this case, and thus that First

American is liable for Lincoln Financial's fraudulent conduct in connection with those transactions.[1]

Lincoln Financial did not act as First American's agent when performing closings because

implied agency cannot exist contrary to clear written agreements and because Bergin Financial has

not produced sufficient evidence of apparent agency.[2]  The written agency agreement in this case

provides that Lincoln Financial did not have actual authority to close real estate transactions as First

American's agent.  The agency agreement states that Lincoln Financial is an agent of First American

"only for the purposes and in the manner specifically set forth in this agreement and for no other

purpose and in no other manner whatsoever," and the agreement sets forth only one

purpose—"issu[ing] . . . title insurance commitments and policies"—for which Lincoln Financial

---

[1]First American filed a motion on appeal challenging this court's appellate jurisdiction on the grounds that (1) the final judgment in this case was improperly manufactured by the dismissal of many claims without prejudice and (2) the notice of appeal was filed too late to appeal the opinion and order granting First American's motion for summary judgment.  A motions panel of this court denied First American's motion to dismiss.  *Bergin Fin., Inc. v. First Am. Title Co.*, No. 08-2453 (6th Cir. Nov. 24, 2009) (order denying motion to dismiss) (citing *Hicks v. NLO, Inc.*, 825 F.2d 118, 120 (6th Cir. 1987)).

[2]Application of Michigan agency law is clearly appropriate with respect to the three state-law causes of action—conspiracy, fraud, and negligent misrepresentation.  The district court also applied Michigan agency law to the RICO claims.  Bergin Financial does not suggest any basis outside Michigan agency law for establishing agency, so we assume that Michigan law also determines Lincoln Financial's agency relationship with First American for RICO purposes.

could act as First American's agent. Under Michigan law, implied authority is one form of actual authority, *Auto-Owners Ins. Co. v. Mich. Mut. Ins. Co.*, 565 N.W.2d 907, 912 (Mich. Ct. App. 1997), and such authority is generally defined as the authority "to do business in the principal's behalf in accordance with the general custom, usage and procedures in that business," *Meretta v. Peach*, 491 N.W.2d 278, 280 (Mich. Ct. App. 1992). Because implied authority is a form of actual authority, "[a]n implied agency cannot exist contrary to the express intention of an alleged principal." *Flat Hots Co. v. Peschke Packing Co.*, 3 N.W.2d 295, 297 (Mich. 1942). The clear contractual provisions demonstrate that Lincoln did not have actual authority—express or implied—to act as First American's agent when closing real estate transactions.

This conclusion accords with the most factually analogous case decided by a Michigan court, *Pal Properties LLC v. Ticor Title Insurance Co.*, No. 280389, 2008 WL 5158894 (Mich. Ct. App. Dec. 9, 2008). In *Pal Properties*, the defendant Ticor Title Insurance Company (Ticor) "issued a title insurance commitment with respect to the property, through Consolidated Title Services, LLC [(Consolidated)], and Consolidated appeared at and conducted the closing." *Id.* at *1. Consolidated failed to pay off an existing mortgage, and the purchaser "eventually lost the home to foreclosure." *Id.* The purchaser sued Ticor, alleging that Consolidated was acting as Ticor's agent when conducting the closing and thus that Ticor was liable for Consolidated's misconduct. *See id.* The Michigan appellate court determined that Ticor and Consolidated had an agency relationship, and applied a rule that "a written agency agreement defines the scope of an agent's undertaking." *Id.* at *2. Even though that contract included an arguably broad delegation of authority—Consolidated was

appointed as an agent "for promoting and transacting of a title insurance business"—the court

interpreted that agreement as not granting Consolidated the authority to conduct closings on behalf

of Ticor. *Id.* at *2-3. Because the agency agreement at issue in this case is even more limited than

the agreement at issue in *Ticor*, that case strongly supports a conclusion that Lincoln Financial did

not have implied authority to close real estate transactions as an agent for First American under

Michigan law. A published federal circuit court case, interpreting a relevantly identical contract

between First American and a different independent agent, reached the same result under Missouri

law. *See Bluehaven Funding, LLC v. First Am. Title Ins. Co.*, 594 F.3d 1055, 1056-60 (8th Cir.

2010).

The conclusion that Lincoln Financial did not act as First American's agent when closing real

estate transactions is also supported by industry practice. Title insurance industry practice generally

requires an additional document—a closing protection letter—before title insurance companies can

be liable for the actions of their independent title insurance agents when those agents are conducting

closings. As a district court recently explained,

> [b]ecause there is a difference between closing and issuing a policy, lenders routinely
> ask for a "closing protection letter" to be issued on behalf of the underwriter. In a
> closing protection letter, the underwriter agrees to indemnify the lender for any
> problems that arise from the closing agent's failure to properly apply the funds, as set
> forth in the closing instructions, and the title insurance commitment.

*Ticor Title Ins. Co. v. Nat'l Abstract Agency, Inc.*, No. 05-CV-73709-DT, 2008 WL 2157046, at *5

(E.D. Mich. May 22, 2008). No such closing protection letter was issued in this case.

That Lincoln Financial's president, Bluhm, believed he was acting as First American's agent when closing real estate transactions does not support the opposite conclusion. Bergin Financial points to Bluhm's testimony that he believed his settlement activities were part of his agency contract, and asks this court to apply a rule that "[i]mplied authority is the authority which an agent believes he possesses," *Meretta*, 491 N.W.2d at 280. The statement from *Meretta* is not a rule of law in Michigan. This statement appears in Michigan cases as a general characterization of implied authority, and Bergin Financial points to no cases in which a Michigan court applied this statement as a rule or held that an agent's belief constituted a sufficient condition of implied agency.[3]

First American's knowledge that Lincoln Financial closed real estate transactions is also not sufficient to demonstrate implied authority. A principal's knowledge of general industry customs can demonstrate the principal's granting of implied authority to an agent that operates within those customs. *See id.* In this case, however, it was not demonstrative of agency for First American to allow Lincoln Financial to close real estate transactions because Lincoln Financial was perfectly capable of performing closings under its own name and not as an agent of First American.

The Underwriting Alerts and Escrow Bulletins also do not demonstrate that Lincoln Financial was an agent of First American for the purpose of closing real estate transactions. Bergin Financial relies upon the phrasing of the documents to argue that First American had the authority to control the closing activities of Lincoln Financial. But the strength of this inference is greatly diminished

---

[3]Indeed, in the only case cited on this point by Bergin Financial, the Court of Appeals of Michigan held that the alleged agent did not have implied authority to bind the principal. *Auto-Owners*, 565 N.W.2d at 912-13.

by the fact that these notices were sent to two audiences: First American's internal closing personnel and its independent insurance agents. The tone of the notices is apparently more appropriate to the internal personnel, over whom First American did exert detailed control. One might still be able to draw some inference of First American's control over Lincoln Financial from the bulletins, but that inference would not be sufficient to overcome the terms of the agency agreement. Those terms limit the scope of Lincoln Financial's agency and provide that only written and signed documents can amend the agency agreement.

The Michigan cases cited by Bergin Financial stating the proposition that "the existence of a principal-agent relationship is generally for the jury to decide" are not applicable because those cases involved questions of agency not determined by written agreements. *See Lincoln v. Fairfield-Nobel Co.*, 257 N.W.2d 148, 150-51 (Mich. Ct. App. 1977); *see also Meretta*, 491 N.W.2d at 280-81. Michigan courts have held that where an agency relationship is "defined by written agreement, it is the province of the trial judge to determine the relationship." *Birou v. Thompson-Brown Co.*, 241 N.W.2d 265, 268 (Mich. Ct. App. 1976) (citing *Keiswetter v. Rubenstein*, 209 N.W. 154 (Mich. 1926)).

The cases cited by Bergin Financial in which a court held that conducting real estate closings was within the scope of an independent title insurance company's agency do not support a conclusion that Lincoln Financial had implied authority to close real estate transactions on behalf of First American. In *Ticor*, the only other case cited by Bergin Financial that interprets Michigan law, an independent agent had wrongly appropriated funds from an escrow account, and the title

insurance company had become liable for the lost funds under closing protection letters. 2008 WL 2157046, at \*3, \*5. The title insurance company sued its agent, arguing that the agent was liable for the funds that the title insurance company had paid pursuant to the closing protection letters. *See id.* at \*1. The district court concluded that the agent was liable because it owed the title insurance company fiduciary duties, whether or not the agent was acting as an agent for the title insurance company while conducting closings. *Id.* at \*8. As an alternative basis for decision, the court also found that the agent "conducted closings within the scope of its agency relationship with [the title insurer]," *id.*, notwithstanding a contractual provision limiting the scope of the agent's authority to conducting title insurance business. The court determined that the title insurance company had produced clear and convincing evidence that the parties had waived or modified that contractual limitation. *Id.* (citing *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 253-54 (Mich. 2003)). Bergin Financial does not argue contractual waiver or modification and does not present evidence sufficient to support such a claim in this case. *See Quality Prods.*, 666 N.W.2d at 254 ("In cases where a party relies on a course of conduct to establish waiver or modification, the law of waiver directs our inquiry and the significance of written modification and anti-waiver provisions regarding the parties' intent is increased."). *Ticor* thus does not undermine our conclusion that Lincoln Financial was not First American's agent for the purpose of closing real estate transactions. The other, non-Michigan, cases cited by Bergin also do not provide any basis on which to disregard the rule stated by *Flat Hots* and *Pal Properties* that written agency agreements

govern the scope of an agent's authority. Lincoln Financial thus did not have actual authority—express or implied—to close real estate transactions on First American's behalf.

Bergin Financial has also not established that Lincoln Financial had apparent authority to close real estate transactions as First American's agent. Under Michigan law, apparent agency only exists where "the alleged principal [has] made a representation that leads the plaintiff to reasonably believe that an agency existed and to suffer harm on account of a justifiable reliance thereon." *Little v. Howard Johnson Co.*, 455 N.W.2d 390, 394 (Mich. Ct. App. 1990); *see Pal Properties*, 2008 WL 5158894, at *3-4 (citing *Chapa v. St. Mary's Hosp. of Saginaw*, 480 N.W.2d 590, 592 (Mich. Ct. App. 1991)). Bergin Financial relies upon a website printout from June 2007 to establish that First American made a representation that could justify a reasonable belief that an agency relationship existed. This evidence is not sufficient for two reasons. First, the evidence itself was not authenticated and there is no evidence that the website existed in this form in 2002. Second, there is no evidence that anyone from Bergin Financial ever saw this website or that Bergin Financial relied upon this alleged representation. As in *Pal Properties*, Bergin Financial has not produced any evidence that it had any contact with First American before or during the closing of the relevant transactions. *See* 2008 WL 5158894, at *4. Absent evidence of a representation made by First American and relied upon by Bergin Financial, Bergin Financial cannot establish apparent agency. First American is therefore not liable for Lincoln Financial's actions as a closing agent.

Bergin Financial also presented no evidence sufficient to establish First American's direct liability for civil conspiracy. In addressing this issue, Bergin Financial repeats its claim that Lincoln

Financial notified First American that Lincoln Financial was under investigation for the ABN Scheme and that the Bergin loans were similar to the ABN loans. These conclusions are debatable, but regardless of their truth, these assertions are insufficient to establish that First American was involved in a conspiracy to defraud Bergin Financial. In a civil conspiracy case, "[t]he agreement, or preconceived plan, to do the unlawful act is the thing which must be proved." *Temborius v. Slatkin*, 403 N.W.2d 821, 828 (Mich. Ct. App. 1986). Bergin Financial stresses that for such a claim, "[d]irect proof of agreement is not required," that "[i]t is sufficient if the circumstances, acts and conduct of the parties establish an agreement in fact," and that "conspiracy may be established by circumstantial evidence and may be based on inference." *Id.* Even so, none of the evidence even inferentially supports First American's involvement in a civil conspiracy. Bluhm's testimony could be construed to support a conclusion that Lincoln Financial notified First American of the investigations into the ABN Scheme, but there is no evidence that Bluhm notified First American that he had been involved in that scheme as opposed to merely having failed to detect and prevent it. For this reason, Bergin Financial has not produced sufficient evidence of First American's knowledge of the fraud at issue in this case, and certainly has not produced sufficient evidence that First American conspired to defraud Bergin Financial.

Bergin Financial does not assert that First American is directly liable on either Bergin Financial's fraud, negligent misrepresentation, or RICO claims.

Lincoln Financial was not First American's agent for the purpose of closing real estate transactions, and Bergin Financial has not produced sufficient evidence of direct misconduct by First American. We therefore **AFFIRM** the judgment of the district court.