RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0140p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JPMORGAN CHASE BANK, N.A.,

*Plaintiff,*

FEDERAL DEPOSIT INSURANCE CORPORATION,

*Intervenor Plaintiff-Appellee,*

*v.*

FIRST AMERICAN TITLE INSURANCE COMPANY,

*Defendant-Appellant.*

Nos. 12-2094;13-1172

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit
Nos. 2:09-cv-14891; 2:09-cv-14915—Marianne O. Battani, District Judge.

Argued: January 23, 2014

Decided and Filed: July 2, 2014

Before: COLE, GILMAN, and DONALD, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Matthew A. Kairis, JONES DAY, Columbus, OH, for Appellant. Jerome A. Madden, FEDERAL DEPOSIT INSURANCE CORPORATION, Arlington, Virginia, for Appellee. **ON BRIEF:** Matthew A. Kairis, Chad A. Readler, JONES DAY, Columbus, OH, for Appellant. Jerome A. Madden, FEDERAL DEPOSIT INSURANCE CORPORATION, Arlington, Virginia, for Appellee.

_____

**AMENDED OPINION**

_____

BERNICE B. DONALD, Circuit Judge.  First American Title Insurance Company ("First American") appeals the $2,263,510.78 final judgment entered in favor of the Federal Deposit Insurance Corporation ("FDIC") after a jury trial on the issue of damages in this diversity breach of contract action.  First American contends the district court erred by granting summary judgment to the FDIC on the issue of liability for breach of a closing protection letter, by upholding the jury's verdict over First American's various objections, and by denying First American's motion for relief from judgment under Federal Rule of Civil Procedure 60(b)(2).  We disagree and now **AFFIRM** the judgment of the district court.

I.

First American underwrites title insurance policies for property owners and mortgage lenders.  Patriot Title Agency, LLC ("Patriot") formerly was an agent authorized to issue title commitments and policies underwritten by First American in Michigan.  In September of 2007, Patriot closed a real estate transaction in which Washington Mutual Bank ("WaMu") loaned $4,543,593.07 to Ha Truong ("the Truong transaction") for the purchase of property in Grosse Ile, Michigan ("the Bellerive property").  WaMu secured the loan with a first-priority mortgage on the property.  Patriot issued a commitment to provide title insurance, underwritten by First American, to WaMu in connection with the transaction, as well as a closing protection letter ("CPL").

In the CPL, First American agreed to indemnify WaMu for actual losses arising from Patriot's fraud or dishonesty in connection with the closing.  Specifically, the CPL provided:

> When title insurance of First American Title Insurance Company is specified for your protection or the protection of a purchase from you in connection with closings of real estate transactions on land located in the state of Michigan in which you are to be the seller or purchaser of an interest in the land or a lender secured by a mortgage (including any other security instrument) of an interest in land, the Company . . . hereby agrees to reimburse you for actual loss incurred by you in connection with such closing when conducted by the Issuing Agent (an

Agent authorized to issue title insurance for the Company), referenced herein and when such loss arises out of:

. . .

> 2.     Fraud or dishonesty of the Issuing Agent handling your funds or documents in connection with such closing.

In March of 2008, First American discovered that the Truong transaction was a sham. Randy Saylor, Patriot's owner, had orchestrated a fraud in order to retain the proceeds of the WaMu loan and purchase the Bellerive property for himself. In June 2008, First American obtained title to the Bellerive property and negotiated with WaMu to sell it in order to cover losses WaMu suffered due to Saylor's fraud. On September 25, 2008, however, federal regulators closed WaMu, and the FDIC became its Receiver.

That same day, the FDIC entered into a Purchase and Assumption Agreement ("P & A Agreement") with JPMorgan Chase Bank ("Chase") whereby the FDIC sold nearly all of WaMu's assets to Chase. Section 3.1 of the P & A Agreement provides that, subject to Section 3.5, "the Assuming Bank [Chase] hereby purchases from the Receiver [FDIC], and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank [Chase], all right, title, and interest of the Receiver in and to all of the assets . . . of the Failed Bank [WaMu]." Section 3.5, in turn, incorporates the attached Schedule 3.5 to identify the assets that Chase did not purchase. Section (2) of Schedule 3.5 provides in pertinent part that Chase did not purchase the following:

> (2)     any interest, right, action, claim, or judgment against . . . (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank; provided, that for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered . . . .

Under the P & A Agreement, Chase purchased the title insurance commitment Patriot issued to WaMu in connection with the Truong transaction and had the right to bring a claim against First American, the underwriter, on that commitment. Attempting to resolve this outstanding claim, First American tendered a quitclaim deed for the Bellerive property to Chase on December 4, 2009. Chase, however, refused to accept that deed.

First American then filed suit against Chase in the Wayne County Circuit Court on December 16, 2009, seeking a declaration that First American had fulfilled its obligations under the title insurance commitment by tendering a deed to the Bellerive property. Chase, in turn, filed suit against First American in the United States District Court for the Eastern District of Michigan the next day, requesting a declaration that the deed was void and seeking money damages. On December 18, 2009, Chase removed the state court suit to the Eastern District of Michigan, and the district court consolidated the actions.

In early 2010, the FDIC notified First American that it intended to intervene in the lawsuit to state a claim for breach of the CPL. The district court granted the motion to intervene over First American's objection. The FDIC filed its complaint in intervention on June 14, 2010, alleging one count of breach of contract against First American based on the CPL.

Subsequently, on September 24, 2010, First American and Chase agreed to appoint a Receiver to sell the Bellerive property. After the Receiver accepted a third-party offer to purchase that property, on April 11, 2011, First American and Chase stipulated to an order of dismissal with prejudice of both Chase's claims against First American and First American's claims against Chase. Thereafter, only the FDIC and First American remained parties to the suit.

Just before Chase's dismissal from the suit, but after discovery closed on February 1, 2011, Chase and the FDIC entered into a stipulation concerning ownership of the CPL. That stipulation stated:

> 1.      On September 25, 2008, Chase and the FDIC/Receiver entered into a Purchase and Assumption Agreement . . . .  Pursuant to the Purchase and Assumption Agreement, Chase acquired certain assets of the Washington Mutual Bank ("WaMu"); and
>
> 2.      Chase did not acquire the CPL claim that the FDIC/Receiver is purs[u]ing in this action pursuant to the Purchaser and Assumption Agreement, and Chase claims no interest in that CPL claim.

Two weeks after Chase's dismissal from the action, on April 28, 2011, the district court held a hearing on the FDIC's and First American's cross-motions for summary judgment. First American argued in its two motions that the FDIC did not have standing to assert a claim under the CPL and, even if the FDIC did have standing, it did not incur any "actual loss" due to the

Truong transaction and therefore could not recover under the CPL. The FDIC argued in its motion that First American had admitted facts establishing liability and that the FDIC suffered an "actual loss" of at least $1.7 million.

On June 10, 2011, the district court denied First American's motions for summary judgment and granted the FDIC's motion as to liability but denied it as to damages. The parties then proceeded to trial on the issue of damages, and a jury awarded the FDIC $2,263,510.78 on December 1, 2011. After trial, First American filed a renewed motion for judgment as a matter of law, an alternative motion for a new trial, and a motion to alter or amend the judgment. The district court denied those motions on June 20, 2012, and First American filed a timely Notice of Appeal from the final judgment on August 15, 2012.

While its initial appeal was pending in this Court, on November 20, 2012, First American filed a Federal Rule of Civil Procedure 60(b)(2) ("Rule 60(b)(2)") motion for relief from judgment based on newly discovered evidence. The district court denied this motion on January 31, 2013, and First American filed another timely Notice of Appeal. This consolidated appeal followed.

II.

First American argues that the district court committed multiple reversible errors. Its primary argument is that the lower court improperly granted summary judgment to the FDIC on the issue of liability for breach of the CPL. First American also contends that the district court erred when it upheld the jury's verdict over First American's objections that the verdict was based on an inadmissible hearsay document, imposed double liability, and incorrectly included a jury-determined amount of pre-complaint interest. Finally, First American asserts that the district court improperly denied its Rule 60(b)(2) motion for relief from judgment. We address each argument in turn.

A.

We begin with the argument that the district court erred when it granted summary judgment to the FDIC on the issue of liability. We review de novo a district court's grant of summary judgment. *Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013). Summary

judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We must view facts in the record and reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This Court does not weigh evidence, assess credibility of witnesses, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If there are no disputed material facts, we review de novo "whether the district court properly applied the substantive law." *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004).

First American attacks the district court's grant of summary judgment to the FDIC on several grounds. First American argues that (1) CPLs cannot be severed from related title insurance commitments; (2) the district court erred by relying on the FDIC-Chase stipulation as to ownership of the CPL; and (3) the FDIC has no right to bring a claim on the CPL because it sold that claim to Chase. None of these arguments, however, merits reversal of the district court's grant of summary judgment.

1.

The district court found that, in general, a party can bring a breach of contract claim on a CPL independent of the related title insurance commitment because "closing protection letters and title policies protect against entirely different risks." First American argues that this decision was error.

The Michigan Court of Appeals described the role of a CPL in *New Freedom Mortgage Corp. v. Globe Mortgage Corp.*, 761 N.W.2d 832 (Mich. Ct. App. 2008). Generally, companies that issue title insurance commitments also issue CPLs "[t]o verify the agent's authority to issue the underwriter's policies and to make the financial resources of the national title insurance underwriter available to indemnify lenders and purchasers for the local agent's errors or dishonesty with escrow or closing funds." *Id.* at 842 (quoting 2 Joyce Palomar, Title Ins. Law, § 20:11 (2010)) (internal quotation marks omitted). CPLs are incidental to title insurance, used "to persuade customers to trust their agents, so that their policies can be sold." *Id.* at 842-43 (quoting Palomar, § 20:13) (internal quotation marks omitted). Even though CPLs are incidental, consideration supports them, namely the purchase of the insurance policy. *Id.* at 843.

Accordingly, "a breach of contract action [on a CPL] may be maintained independent of the title insurance policy." *Id.*; *see also Lehman Bros. Holdings, Inc. v. Hirota*, No. 8:06-cv-2030-T-24MSS, 2007 WL 1471690, at *6 (M.D. Fla. May 21, 2007); *Lawyers Title Ins. Corp. v. New Freedom Mortg. Corp.*, 655 S.E.2d 269, 274 (Ga. Ct. App. 2007).

The Michigan Court of Appeals' observation that a CPL may support a breach of contract claim independent of any related title insurance policy is logical, especially considering that the parties agree that a CPL is an indemnity agreement and not an insurance policy. In a CPL, "the underwriter agrees to indemnify the lender for any problems that arise from the closing agent's failure to properly apply the funds, as set forth in the closing instructions, and the title insurance commitment." *Bergin Fin., Inc. v. First Am. Title Co.*, 397 F. App'x 119, 125 (6th Cir. 2010) (quoting *Ticor Title Ins. Co. v. Nat'l Abstract Agency, Inc.*, No. 05-CV-73709-DT, 2008 WL 2157046, at *5 (E.D. Mich. May 22, 2008)). Conversely, a title insurance policy "insures only that the title to such property is unencumbered by unknown liens, easements, and the like which might affect the property's value." *First Fed. Sav. & Loan Ass'n v. Transamerica Title Ins. Co.*, 19 F.3d 528, 530 (10th Cir. 1994). The district court was thus correct that "closing protection letters and title policies protect against entirely different risks."

After making this finding, the district court acknowledged that the *New Freedom*, *Hirota*, and *Lawyer's Title* courts "were never specifically asked to rule on whether an addressee could bring a closing protection letter claim independent of a claim under a related title policy." The district court nonetheless found those cases "persuasive because they establish that the coverage afforded under the letter is wholly separate from the coverage under a title policy." We agree with the district court that the "protections under the instant CPL are not supplemental or ancillary to the Title Policy." The district court therefore did not err when it found that, in general, a party can bring a breach of contract claim on a CPL independent of the related title insurance policy.

First American argues, however, that the plain language of the CPL at issue here "expressly dictates that its rights can only be held by the owner of the title policy." Appellant Br. at 35. To support this argument, First American relies on the following language in the opening paragraph of the CPL:

When title insurance of First American Title Insurance Company is specified for your protection or the protection of a purchase from you in connection with closings of real estate transactions on land located in the state of Michigan in which you are to be the seller or purchaser of an interest in the land or a lender secured by a mortgage (including any other security instrument) of an interest in land . . . .

We disagree that this language prohibits the FDIC from bringing a claim for breach of the CPL.

The introductory language on which First American relies does not prevent the FDIC from bringing a claim for breach of the CPL because WaMu satisfied the requirements identified there, and the FDIC stepped into WaMu's shoes by operation of law.  At the time First American issued the CPL to WaMu, a First American title policy was "specified for [WaMu's] protection." WaMu was also "to be . . . a lender secured by a mortgage . . . of an interest in land." Subsequently, when the FDIC took WaMu into receivership, the FDIC "succeed[ed] to . . . all rights, titles, powers, and privileges of" WaMu.  12 U.S.C. § 1821(d)(2)(A)(i).  The FDIC accordingly had all the same rights as WaMu in the CPL, and it may bring a breach of contract claim based on that document.

The FDIC's subsequent sale of the loan and title insurance commitment from the Truong transaction to Chase likewise does not prevent the FDIC from bringing a breach of contract claim on the CPL.  The CPL explicitly grants rights to WaMu and "its successors and/or assigns as their interest may appear."  As WaMu's Receiver and successor, this language grants rights to the FDIC.  No language in the CPL "provides that WaMu would lose its indemnification rights if it subsequently sold the Truong Loan and Title Policy," so the sale of the loan and title insurance commitment did not change the FDIC's rights under the CPL.  *See* P & A Agreement, Schedule 3.5, § 2.  The district court therefore did not err when it found that the FDIC is eligible to recover under the CPL at issue here.

2.

We will consider First American's second and third attacks on the district court's grant of summary judgment together because those arguments are closely related.  First American contends that the district court erred by relying on the FDIC-Chase stipulation concerning ownership of the CPL rather than interpreting the P & A Agreement.  It also argues that the

P & A Agreement unambiguously transferred the CPL at issue here from the FDIC to Chase, depriving the FDIC of standing to sue on the CPL.

Addressing First American's defense that the FDIC lacked standing to sue on the CPL in its order granting in part and denying in part the FDIC's motion for summary judgment, the district court reasoned:

> Based on its own interpretation of the P & A Agreement, First American contends that FDIC sold the CPL claim to Chase and FDIC has no standing to bring suit. The Court declines to visit the interpretation issues because First American has not shown how it escapes the well-established rule that a stranger to a contract has no standing to challenge the parties' mutual understanding of their own contract. *See City of Grosse Pointe Park v. Michigan Municipal Liability and Property Pool*, 473 Mich. 188, 702 N.W.2d 106, 114 (2005). FDIC and Chase agree that FDIC retained the CPL claim and have signed a Stipulation acknowledging the same. (Doc. 108 Ex. A). The Court will not interfere with the parties' intent. *See Rasheed*, 517 N.W.2d at 29 n. 28; *UAW–GM Human Resource Center v. KSL Recreation Corp.*, 228 Mich.App. 486, 579 N.W.2d 411, 414 (1998).

But the district court should not have relied on Michigan law because the P & A Agreement expressly provides: "THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE FEDERAL LAW OF THE UNITED STATES OF AMERICA . . . ." This Court follows section 187 of the Restatement (Second) of Conflicts of Laws when determining whether to give effect to a choice-of-law provision in a contract. *DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922-23 (6th Cir. 2006) ("In the absence of any established body of federal choice of law rules, we begin with the Restatement (Second) of Conflicts of Law[s] . . . ." (quoting *Med. Mutual of Ohio v. deSoto*, 245 F.3d 561, 570 (6th Cir. 2001) (internal quotation marks omitted))). Because "the particular issue is one which the parties could have resolved by an explicit provision in their agreement" and there is a "reasonable basis for the parties' choice" of federal law, the district court should have followed the choice-of-law provision and applied federal law when considering the P & A Agreement. Restatement (Second) Conflicts of Laws § 187(1), (2)(a). The district court's error in applying Michigan law is not a reversible one, however, because applying federal law yields the same result. *See City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 251 (6th Cir. 1994)

(citing *Hilliard v. U.S. Postal Serv.*, 814 F.2d 325, 326 (6th Cir. 1987)) ("[W]e may affirm on any grounds supported by the record, even though they may be different from the grounds relied on by the district court.").

Section 13.5 of the P & A Agreement expressly provides that the contract should not be construed "to give any Person other than the Receiver, the Corporation and the Assuming Bank any legal or equitable right, remedy or claim under or with respect to this Agreement or any provisions contained herein."  Based on this language, our sister circuits uniformly have held that parties attempting to rely on the P & A Agreement to invoke a court's jurisdiction lack prudential standing to do so because they are neither parties to nor third-party beneficiaries of the agreement.  *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 12-3302-CV, 2014 WL 401303, at *3-5 (2d Cir. Feb. 4, 2014) ("We conclude that Hillside does not have prudential standing in this case because it cannot enforce the terms of the [P & A Agreement], as to which it is neither a party nor a third-party beneficiary, but the enforcement of which is a necessary component of its claim."); *Excel Willowbrook, LLC v. JP Morgan Chase Bank, Nat'l Ass'n*, 740 F.3d 972, 979 (5th Cir. 2014) (reasoning that "the interest of maintaining uniformity in the construction and enforcement of federal contracts—an area where uniformity is critical—" required holding that plaintiffs were not intended beneficiaries of the P & A Agreement); *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 933 (11th Cir. 2013) ("We . . . find that the P & A Agreement does not provide a 'clear intent' to benefit Interface. Thus, we conclude that Interface is not an intended third-party beneficiary to the P & A Agreement and cannot sue to enforce it."); *GECCMC 2005-C1 Plummer St. Office Ltd. P'ship v. JPMorgan Chase Bank, Nat'l Ass'n*, 671 F.3d 1027, 1036 (9th Cir. 2012) ("Because GE is not an intended third-party beneficiary of the P & A Agreement, GE has no enforceable rights under that contract.").

More analogous to the present case, however, is the D.C. Circuit's decision in *Deutsche Bank National Trust Co. v. FDIC*, 717 F.3d 189 (D.C. Cir. 2013), where the court addressed the prudential standing of a proposed intervenor rather than a plaintiff.  *Id.* at 194 ("Of course, appellants are seeking to intervene, not to bring a cause of action under the Agreement itself.").  The D.C. Circuit reasoned that the intervenors lacked prudential standing because "[i]nsofar as

the Proposed Intervenors wish to be heard on the specific question of contract interpretation, they are effectively seeking to enforce the rights of third parties (here, the FDIC), which the doctrine of prudential standing prohibits." *Id.*  We find this reasoning persuasive and equally applicable to a defendant who attempts to defend against a claim by asserting a legal right belonging to a third party.  The Supreme Court repeatedly has recognized that "a litigant must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982)) (internal quotation marks omitted) (inquiring into the standing of both the petitioners and the respondent).  Accepting First American's argument that it may be heard on the issue of contract interpretation here would allow it to assert Chase's right to claim ownership of the CPL under the P & A Agreement.

Because First American is neither a party to nor a third-party beneficiary of the P & A Agreement, it lacks prudential standing to challenge the FDIC's and Chase's understanding of their own contract.  *See Deutsche Bank*, 717 F.3d at 194.  The district court therefore did not commit reversible error when it granted summary judgment to the FDIC on the issue of liability for breach of the CPL.

B.

We now turn to First American's arguments attacking the jury's verdict.  First American alleges that the verdict was the product of speculation based on an inadmissible hearsay document, that it imposed double liability on First American, and that it improperly included a jury-determined amount of pre-complaint interest.

1.

During the jury trial, the FDIC relied heavily on a spreadsheet containing WaMu loan data, Plaintiff's Exhibit 7 ("PX7"), to prove its actual loss.  The district court admitted the spreadsheet into evidence as a self-authenticating business record under Federal Rule of Evidence 902(11) and as an exception to the rule against hearsay under Federal Rule of Evidence 803(6).  First American argues that the FDIC did not properly certify the record and that the

record does not have the required indicia of trustworthiness to qualify as a hearsay exception. We review a district court's evidentiary rulings for abuse of discretion. *Harlamert v. World Finer Foods, Inc.*, 489 F.3d 767, 773 (6th Cir. 2007). We will reverse only if "the ruling is based on 'an erroneous view of the law or a clearly erroneous assessment of the evidence.'" *United States v. Dotson*, 715 F.3d 576, 582 (6th Cir. 2013) (quoting *United States v. Semrau*, 693 F.3d 510, 520 (6th Cir. 2012)).

The district court considered the contents of the declaration of Matthew C. Horvat, Vice President and Applications Developer for Chase, that the FDIC presented as certification of the business record—as well as the trial testimony of Horvat's former supervisor, Jean Wojciechowski, a Vice President of Finance at Chase—and found the declaration sufficient to establish that the loan data in PX7 was a business record first of WaMu and then of the FDIC. The district court properly considered Rules 902(11) and 803(6), and its assessment of Horvat's declaration and Wojciechowski's testimony was not clearly erroneous. *See Dotson*, 715 F.3d at 582 (quoting *Semrau*, 693 F.3d 520). Accordingly, the district court did not abuse its discretion when it admitted PX7 into evidence.

Additionally, PX7 constitutes adequate proof of the FDIC's "actual loss" based on Patriot's fraud. The parties do not dispute that WaMu wired $4,543,593.07 to Patriot in connection with the Truong transaction or that Patriot's owner, Saylor, diverted those funds for his own benefit. PX7 shows that at the time the FDIC took WaMu into receivership, the "book value" of the loan from the Truong was $2,677,500. After the FDIC received "book value" for the loan from Chase under the P&A Agreement, the FDIC was still $1,866,093.07 short of the amount Saylor fraudulently misappropriated. The district court therefore did not err when it found that "Patriot Title's fraud was the most direct, natural, and foreseeable cause of WaMu's loss," and that the jury's verdict was based on more than speculation.

2.

First American next argues that the district court committed a clerical error that subjects First American to double liability; namely, miscalculating the value that Chase received from First American following the court-appointed Receiver's sale of the Bellerive property involved in the Truong transaction. This argument lacks merit.

The court-appointed Receiver transferred $1,909,732.90 to Chase after selling the Bellerive property. The jury verdict entered by the district court in favor of the FDIC was for $2,263,510.78. First American's total liability to both parties, then, was $4,173,243.68, which is less than the $4,543,593.07 that WaMu transferred to Patriot for the Truong transaction. The district court therefore did not commit a clerical error that subjects First American to double liability.

3.

First American's final attack on the jury's verdict concerns the calculation of pre-complaint interest. According to First American, pre-complaint interest is an issue committed to the discretion of the trial judge, and the district court's decision to place responsibility for calculating pre-complaint interest in the hands of the jury constitutes reversible error.

Initially, we must address the FDIC's contention that First American forfeited this argument on appeal by not developing it fully in the briefing. Although First American's briefing includes only a few paragraphs discussing pre-complaint interest, First American did cite to and address the district court's actions as well as assert an argument, however limited, for reversal. *Cf. Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 483 (6th Cir. 2007) ("In her briefs, Langley failed to discuss or cite to the district court's analysis in any detail. . . . As Langley has not addressed the controlling issues or only 'adverted to [them] in a perfunctory manner, unaccompanied by some effort at developed argumentation,' she has waived them." (quoting *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 979 (6th Cir. 2000))). We therefore disagree with the FDIC that First American forfeited this argument.

In its primary brief, First American cites cases involving the application of only federal law, rather than cases applying Michigan law. *See Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 955 F.2d 831, 833-34 (2d Cir. 1992) (stating that "discretionary awards of prejudgment interest . . . under federal law" are based on a four-factor analysis); *EEOC v. Wooster Brush Co. Emps. Relief Ass'n*, 727 F.2d 566, 579 (6th Cir. 1984) (reasoning that awards of prejudgment interest in Title VII cases are within the discretion of the trial court "in the absence of a statutory provision to the contrary"); *Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F. Supp. 2d 853, 865 (W.D. Mich. 2008) (addressing the availability of prejudgment

interest under the Copyright Act).   This Court's precedents, however, clearly state: "[P]rejudgment interest is a substantive aspect of damages in a diversity case and is thus properly viewed as a matter of state law." *Diggs v. Pepsi-Cola Metro. Bottling Co.*, 861 F.2d 914, 924 (6th Cir. 1988) (quoting *Bailey v. Chattem, Inc.*, 838 F.2d 149, 159 (6th Cir. 1988)) (internal quotation marks omitted); *see also Jack Henry & Assocs. v. BSC, Inc.*, 487 F. App'x 246, 257 (6th Cir. 2012) (same).

We therefore look to Michigan law, "the law of the state that governs the cause of action," *Jack Henry & Assocs.*, 487 F. App'x at 257 (citing *FDIC v. First Heights Bank, FSB*, 229 F.3d 528, 542-43 (6th Cir. 2000)), to determine whether the district court erred when it allowed the jury to determine the amount of pre-complaint interest.   We review de novo the district court's application of state law in a diversity suit. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991) ("We conclude that a court of appeals should review *de novo* a district court's determination of state law.").

"Generally, Michigan courts have included [pre-complaint] interest as an element of damages as a matter of right where the amount claimed is liquidated." *Jones v. Jackson Nat'l Life Ins. Co.*, 819 F. Supp. 1382, 1383 (W.D. Mich. 1993) (citing *Cree Coach Co. v. Wolverine Ins. Co.*, 115 N.W.2d 400 (Mich. 1962); *Gordon Sel-Way, Inc. v. Spence Bros., Inc.*, 440 N.W.2d 907 (Mich. Ct. App. 1989); *Banish v. City of Hamtramck*, 157 N.W.2d 445 (Mich. Ct. App. 1968)).   Damages are liquidated "where 'the amount thereof is fixed, has been agreed upon, or is capable of ascertainment by mathematical computation or operation of law.'" *Kenneth Henes Special Projects Procurement v. Cont'l Biomass Indus.*, 86 F. Supp. 2d 721, 738 (E.D. Mich. 2000) (quoting *Holland v. Earl F. Graves Publ'g Co.*, 33 F. Supp. 2d 581, 583 (E.D. Mich. 1998)).

The district court overruled First American's objection "to the issue of pre-complaint interesting being presented to the jury or being considered by the jury."   In overruling that objection, the district court stated:

> The Court finds that the actual loss which is given a very expansive reading -- or expansive definition would include the pre-complaint interest. I also believe that under Michigan law, at least from my experience, and as a trial judge in Michigan, that this is clearly a case where pre-complaint interest may be awarded

because it is easily calculable, there really is not much of a math situation here, and I do think if this were a state court case it would be allowed, and I think I should allow it here, so I'm going allow the issue to go to the jury.

The district court correctly applied Michigan law when it reasoned that the FDIC's damages would include pre-complaint interest as a matter of right if the amount of damages were easily calculable, or liquidated. *See Jones*, 819 F. Supp. at 1383. We agree with the district court that the amount of damages in this case was easily calculable. The lower court determined the maximum amount of First American's liability to the FDIC based on simple arithmetic: damages equal the total amount of the loan from the Truong transaction minus the book value WaMu received from Chase. Because the damages in this case are liquidated, the district court did not err when it submitted the issue of pre-complaint interest to the jury.

C.

Finally, First American argues that the district court erred when it denied First American's Rule 60(b)(2) motion for relief from judgment based on newly discovered evidence. We review for abuse of discretion a district court's decision to deny a Rule 60(b) motion for relief from judgment. *Doe v. Lexington-Fayette Urban Cnty. Gov't*, 407 F.3d 755, 760 (6th Cir. 2005). This Court will reverse only if we have "a definite and firm conviction that the trial court committed a clear error of judgment." *Id.* (quoting *Davis v. Jellico Comm. Hosp., Inc.*, 912 F.2d 129, 133 (6th Cir. 1990)). To prevail on a Rule 60(b)(2) motion, "a 'movant must demonstrate (1) that it exercised due diligence in obtaining the information and (2) [that] the evidence is material and controlling and clearly would have produced a different result if presented before the original judgment.'" *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 615 (6th Cir. 2012) (alteration in original) (quoting *Good v. Ohio Edison Co.*, 149 F.3d 413, 423 (6th Cir. 1998)). First American thus has the burden to prove its entitlement to relief under Rule 60(b) by clear and convincing evidence. *Info-Hold, Inc. v. Sound Merch., Inc.*, 538 F.3d 448, 454 (6th Cir. 2008).

Even assuming that it satisfies the first requirement for Rule 60(b)(2) relief, First American cannot meet the second requirement that the "evidence [be] material and controlling and clearly would have produced a different result." *HDC*, 675 F.3d at 615 (quoting *Good*, 149

F.3d at 423). In its Rule 60(b)(2) motion, First American relied on evidence that Chase had taken inconsistent positions *in pleadings* in other federal and state court cases regarding ownership of WaMu CPLs. The evidence submitted with the Rule 60(b)(2) motion is not controlling because it is not mandatory authority and does not call into question the FDIC's consistent position throughout this litigation that it owned the CPL. Such evidence therefore would not have produced a different result at the summary judgment stage. Because we do not "have 'a definite conviction that the [district] court committed a clear error of judgment,'" *Doe*, 407 F.3d at 760 (quoting *Davis*, 912 F.2d at 133), the district court did not abuse its discretion when it denied First American's Rule 60(b)(2) motion.

III.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.